360 A.2d 237

**In the Matter of Dale Henry DeSAVAGE,
a minor, Appellant (two cases).**

**Appeal of George DeSAVAGE and
Deborah DeSavage.**

Superior Court of Pennsylvania.
Argued April 12, 1976.
Decided July 7, 1976.

Louis Erteschik, Neighborhood Legal Services, Pittsburgh, for appellant in No. 195.

Eric N. Anderson, Neighborhood Legal Services, Pittsburgh, for appellant in No. 268.

Robert E. Kline, Asst. County Sol., Clifford C. Cooper, Alexander J. Jaffurs, County Sol., James A. Esler, Asst. County Sol., Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge.

This appeal presents an important and difficult question arising under Pennsylvania's Juvenile Act:[1] Does the Act permit the juvenile court to declare a newborn infant "deprived" within the meaning of 11 P.S. § 50–102(4), when the child has never been in the custody of

1.   Act of December 6, 1972, P.L. 1464, No. 333, § 1, et seq.; 11 P.S. § 50–101, et seq.

its natural parents, and the parents have never voluntarily relinquished custody of their child or evidenced an intent to do so? If the Act does authorize such an adjudication, we must then determine what standard applies, and whether the evidence produced in the court below is sufficient to support a finding of deprivation.

█    Appellant, Dale Henry DeSavage, was born on September 21, 1975, to George DeSavage, age fifteen, and Deborah DeSavage, age nineteen. On October 9, 1975, Child Welfare Services of Allegheny County ("CWS") filed a petition requesting that appellant be placed under its supervision.[2]  Following a full and complete hearing on October 15, 1975, the court below held that appellant was a deprived child and ordered that he be placed in the custody of CWS. Both appellant and the natural parents seek review of that order.[3]

Because of the importance of the questions raised in this appeal, it is necessary to outline the background of the parents, as well as the events which caused CWS to file the petition to declare appellant a deprived child. George and Debbie first met in the Lutheran Children's Home while both were in custody of CWS. Debbie was first adjudicated a dependent and neglected child at the age of six, and lived in four different foster homes. On September 1, 1971, however, CWS placed her in the Lutheran Children's Home, where she remained until her eighteenth birthday. At that time, her file was closed by CWS.

The DeSavage family was first referred to CWS in 1970 because of George's truancy. A deprivation peti-

2.  CWS clearly had standing to file the petition: "A petition which shall be verified and may be on information and belief, may be brought by any person including a law enforcement officer. . . ." 11 P.S. § 50–50–314. See also *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974).

3.  Appellant was represented by counsel at the hearing in the lower court, and in this Court, in accordance with 11 P.S. § 50–317.

tion concerning both George and his sister was filed in January, 1972; George was subsequently adjudicated a deprived child and CWS was given supervision. George was placed in the Child Welfare Center, the Juvenile Detention Home, and finally, the Lutheran Children's Home. George remained at the Home from June 30, 1972, until November 21, 1973, when he was permitted to leave in order to spend Thanksgiving with his family. At the end of the vacation, George refused to return to the Home. His mother supported that decision. George lived with his mother, but refused to attend school; all attempts to have him enrolled in a regular school program failed. Finally, on May 6, 1975, CWS decided that it should again seek to obtain supervision of George because he was a truant and had exhibited signs of emotional disturbance. By this time, Debbie was residing in the DeSavage home, and was several months pregnant. George's mother died in June 1975. A hearing was scheduled for July 13, 1975, but was continued until October 15.

George and Debbie, with the consent of George's father, and the permission of a Judge of the Orphans Court Division, were married on September 5, 1975, and obtained their own apartment. Their son was born on September 21, 1975. Debbie was scheduled for release from Allegheny General Hospital on September 24, but the hospital refused to discharge the baby because he had lost over two pounds since birth. When informed of the hospital's decision, George became verbally abusive and had to be removed by a hospital security guard. The parents returned on September 26; they were told by the medical personnel that the baby had developed a rash, and could not be released until the results of certain cultures had been obtained. Debbie understood that it was medically necessary for the infant to remain at the hospital. George, on the other hand, again demanded custody of the child, and again became verbally abusive. He told the

hospital personnel, "You're not going to keep my baby here" and "I'd rather have him dead than in this hospital. He's leaving today, one way or another." George made no effort to listen to the advice of the hospital personnel and his wife. Instead, he responded with a threat: "If you don't release him, I'll be back, and cause the biggest riot you've ever seen."

Because of the medical risk to the child, the hospital obtained a restraining order that day which prevented his removal. The hospital personnel also referred the case to CWS. The factual situation was presented at the monthly SCAN (Suspected Child Abuse) meeting, which was held the following Monday, September 29, 1975. The meeting was attended by several physicians, several nurses, the director of children's services, and George's case worker, many of whom were personally familiar with the facts of the case. At the conclusion of the meeting it was determined that the baby had to remain in the hospital because it had developed a staph infection which required antibiotic treatment, and that the child should not be released in the custody of its parents when he was medically ready for discharge. Thereupon, CWS filed the instant petition.

At the October 15, 1975 hearing, the court first had to dispose of the May 6, 1975 petition seeking to have George declared a deprived child. The court acceded to CWS's request that a final order for supervision be issued "in order to complete educational plans for George in the Letsche Alternative School High School Program." This adjudication is not a subject of the instant appeal. The court then proceeded to receive testimony in the matter of Dale Henry DeSavage.

The first witness was Linda Mitchell of CWS, George's case worker. She informed the court of CWS's recommendation: ". . . Child Welfare feels that there is some question concerning father's maturity and his ability to take care of a child; but since the parents really

never had a chance with the child, it's felt that the Parental Stress Center will be kind of a neutral area where there will be a lot of interaction between parents and child, and where they can be observed and also be a teaching experience for the parents." The Parental Stress Center is a facility with a full-time professional staff to care for the children. The parents, however, are free to come to the Center and take care of their child. In effect, it is a "halfway-house" between a foster home and the home of the natural parents. The parents have the opportunity to develop a relationship with their child, and at the same time receive instruction from professionals in child care. A child is assigned to the Parental Stress Center for a period of four to six weeks with the expectation that the child will then be released to the custody of his parents.

It must be stressed, however, that Ms. Mitchell, although a representative of CWS, did not agree with the CWS recommendation: "I guess I know George pretty well, and I know that he has a pretty bad temper, and oftentimes mouths off about things and you know, this is kind of a reaction that he does have. And usually he doesn't mean any harm by it. Once he calms down he's able to discuss things fairly rationally, and I feel that, you know, this was an instance where he acted very immaturely about it. But *I don't see him as actually harming the baby in any way*. And, you know, knowing Debbie and George, I know they have a fairly nice apartment and they want to take care of the baby. And they've really never had a chance to take care of it. So everything is just pure conjecture at this point . . . No, I don't think there'd be any danger of abuse, but you know *possible* inadvertent neglect, just, you know, by the fact that George and Debbie have never been parents, are both rather young, and their deprived background, I think they could use help in becoming better parents." (Emphasis added). Ms. Mitchell testified that she was

not surprised by George's reaction at the hospital. In the first place, she stated that George reacts to stress by becoming verbally abusive. Secondly, she testified that George and Debbie were afraid that the authorities would not allow them to obtain custody of their child because they were so young. She concluded that George's reaction was a product of his fear.

The next witness was Diane Kilmo, a nurse practitioner at Allegheny General Hospital. She agreed with the CWS recommendation of placement at the Parental Stress Center because of the "high-risk" factors exhibited by the parents: "Neither Debbie or George, neither of them had any strong parenting that they could base their future parenting on. I think that Debbie is very reasonable, the times that I've seen her; I think that she's very concerned and *I do not question her capability of taking care of this baby*. I feel that she could use help. And as I stated before, my question is, how can she cope with both the baby and her husband, who also sees her as a mother figure? And at times in the hospital when she tried to calm him down, I did not really see that she was able to achieve this." (Emphasis added). It must be emphasized that Ms. Kilmo never testified that she feared that the baby would be subject to assault if placed in the custody of his parents:

"Q. Now to what degree are you concerned for the child's well-being, emotional neglect, physical neglect?

"A. I'm concerned with physical neglect and emotional neglect.

"Q. What type of physical neglect are you concerned about?

"A. Physical neglect. Just not caring for the baby properly as far as hygiene, feeding; *I think this is a potential threat* . . . .

"Q. Then are you stating that you feel George would possibly assault the baby, or injure the baby?

"A. I think that George would be a potential to leading to the mother's neglect of the baby, which ultimately could lead to her not being given the opportunity to be a mother to that baby at all . . . ."
(Emphasis added).

Gerry Roston, a medical social worker at Allegheny General Hospital stated: "I found the home to be adequate. And I do not see George as a danger to the newborn baby. I don't see that at all." She would recommend release to the parents with significant involvement from CWS.

The next witness, Dr. Augustine, a pediatrician at Allegheny General, emphatically concurred with the CWS recommendation, primarily because George and Debbie came to the hospital only once during the period that the baby was receiving antibiotic treatment. She was the only witness to testify that a possibility of physical abuse was present:

"Q. Do you feel that if the baby was placed in their home at this time that the baby would be in physical danger?

"A. I think there's a big potential, having the background history and observing how much interest they have shown in this baby during this three-weeks period."

Cynthia Larkby, director of children's services for Northern Communities and coordinator of the SCAN meeting, also agreed with the CWS recommendation: "[The fact] that George reacts with anger and violence in a tense situation supports to me that with a child in that home and any parent with a child, with an infant, is going to be under stress, that the child will be at risk." It must be noted that Ms. Larkby had never met either of the parents.

The final witnesses were George and Debbie. Debbie testified that she was in contact with the hospital at least once every other day, despite the fact that the nurses'

reports did not support this assertion. She also testified that she would be more than willing to have Public Health nurses come to her home and instruct her as to proper baby care. George also stated that he would be willing to cooperate with CWS, regardless of whether the court allowed him to obtain custody or whether the court ordered that the baby be placed at the Parental Stress Center.

I.

Section 2 of the Act defines a "deprived child" as one who: "(i) *is* without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals; or (ii) *has been* placed for care or adoption in violation of law; or (iii) *has been* abandoned by his parents, guardian, or other custodian; or (iv) *is* without a parent, guardian or legal custodian; or (v) *while subject* to compulsory school attendance is habitually and without justification truant from school." 11 P.S. § 50–102(4) (Emphasis added). The first definition is the only one applicable to the facts of the instant case. Appellants contend that because all five definitions of "deprived child" are in either the past or present tense, and because one of the stated purposes of the Juvenile Act is "[t]o preserve the unity of the family whenever possible . . .", 11 P.S. § 50–101, the framers of the Juvenile Act contemplated that in no event would deprivation be defined in terms of future conduct or effect, and that when focusing on the definition concerning proper parental care or control, deprivation would be defined only in terms of present conduct."

Thus, appellants argue that the statute precludes a finding of deprivation on the strength of prognostic evidence, and that a child may be adjudicated deprived only upon proof that it "is without proper parental care or control . . ." in its present environment. In the

instant case, appellant was in the custody of the hospital on the date of the hearing. Appellants contend that the only deprivation petition permitted by the statute under these circumstances, is one alleging that the hospital is unable to render the proper care. They contend that the deprivation petition actually filed was unauthorized because the parents did not have present custody of the child.

Appellants' reading of the statute is certainly plausible, and may very well be correct when applied to the facts of this case. Were it accepted as a proposition of law, however, it would preclude a child welfare agency from *ever* seeking to have a newborn declared a deprived child, no matter how unfit or incompetent the natural parents are. Appellants assert that as a matter of law an infant cannot be adjudicated deprived unless and until the child is actually in the custody of the parents, and they are shown to be unable to render the "care or control" required by the statute.

Obviously, state interference with a parent-child relationship is a most serious intrusion. As will be discussed in the next section, such an intrusion is properly tolerated only in cases in which the Commonwealth sustains a very strict burden of proof. On the other hand, the state certainly has an interest in seeing that minimal standards of care are maintained for the children of this Commonwealth. The rule of law appellants request us to announce is overly restrictive. The legislature defined "deprived child" in exceedingly broad terms precisely because it is impossible to foresee all the possible factual situations that may arise. Further, the broad definition enables the experienced juvenile court judge to apply his training and compassion to the unique facts of each case. The proposition asserted by appellants would compel the juvenile court judge to place the child in the home of the natural parents to determine whether they are able to render proper care, and ignores

the possibility that if the "experiment" proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal. We choose not to force the hand of the juvenile judge. The important interest of the parents are best maintained by applying the strict standard of proof in deprivation cases, not by foreclosing the juvenile court from finding deprivation on the basis of prognostic evidence.

## II.

The standard of proof required to make a finding of deprivation is mandated by the statute: "If the court finds from *clear and convincing evidence* that the child is deprived, the court shall proceed immediately or at a postponed hearing to make a proper disposition of the case." 11 P.S. § 50–320(c) (Emphasis added). We reiterate the forceful expression of this principle announced in *Rinker Appeal*, 180 Pa.Super. 143, 148, 117 A.2d 780 (1955):

"It is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity. Yet, of course, there are cases where such authority must be exercised for the protection and welfare of the children.

"Under our system of government children are not the property of the state to be reared only where and under such conditions as officials deem best. On the other hand the state is interested in establishing a minimum standard of care for a child's physical, intellectual and moral well being. But this minimum standard must be viewed in the light of experience. Although there are many good homes, there is no such thing as a 'perfect home.'

"A child cannot me declared '[deprived]' merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy."

█ It cannot be overemphasized that the "best interests of the child" test is improperly applied in passing upon a deprivation petition. As we said in *Stapleton v. Dauphin County Child Care Service,* supra at 391, 324 A.2d at 572:

"Thus it will be observed that although child custody cases have arisen in a variety of situations, they are consistent with the following propositions: A child will be taken from the parents only on proof of 'clear necessity.' In deciding whether there has been such proof, the court will not appraise the evidence according to the child's 'best interests.' However, once the child has been taken from the parents, the court will appraise the evidence, and award custody, according to the child's best interests. In applying this standard the court will recognize the natural parents' claim to custody. . . .

"To an extent these propositions may seem mere wordplay. It might be said that in fact the two standards are one: that when due consideration is given to the importance of a stable family, it is in the child's 'best interests' for the court not to take custody from the parents except upon 'clear necessity.' As a matter of logic this may be so. As a matter of practice, however, it is useful to state the standards separately. It impresses the trier of fact and the parties with the importance of protecting the

family from intrusion by the state. At the same time it recognizes that the child's situation is fundamentally different when, as here, that intrusion has occurred."

The order of the lower court, therefore, may be affirmed only if the proper standard was applied in evaluating the evidence, and if the proof that George and Debbie would be unable to provide proper care is clear and convincing.

### III.

Although the opinion of the court speaks in terms of deprivation, the record reveals that the court may have applied a "best interests" standard. In questioning George's case worker, the court evidenced a concern that her recommendation was influenced by her relationship with George. Ms. Mitchell readily agreed that it was. The court proceeded:

"Q. But the question is now, aside if you never saw George and are looking at this objectively, *what's best for Dale, because that's the only issue before us right now, what's going to be best for this baby?*

"A. I don't know how you can remove the parents from the child and just look at one part of it.

"Q. You can't, you really can't, but the Judge has to, and that's what I've got to do. *What's going to be best for this baby in terms of its needs right now* and under the conditions and circumstances surrounding this case, and what you know about it . . ." (Emphasis added). Furthermore, the court's view that the Parental Stress Center seemed to provide the perfect solution to this case was apparent:

". . . If she is the caseworker, . . . and she knows George a long time and she has some feelings about George, the question is whether she's giving full consideration to the needs of Dale and separating, if she can in her mind, that the child's needs as opposed to George's

needs—George needs the baby now, his wife needs the baby now, that's their feeling—and if she's now emphasizing with their needs rather than the child's needs, *does the child better need to be in that home, or in a situation where a good evaluation of their parenting ability, their ability to relate to each other with the child*—All they're asking is a chance to observe this in a situation where there is some apparent risk, I think, *is what we're saying.*" (Emphasis added).

Even discounting these remarks, the court's conclusion that "clear necessity requires that the child be placed in protective care" is simply not justified by the record. In the first place, both George's case worker and the medical social worker from Allegheny General Hospital recommended that appellant be placed in the custody of his parents. Although there is little doubt that George and Debbie come from deprived backgrounds, and that George is extremely immature, the lower court's conclusion completely ignores the practical alternative of placing the child in the custody of his parents and ordering CWS to take all steps necessary to instruct George and Debbie in proper child care, and to supervise their parenting. Secondly, the record does not support the conclusion that appellant would be subject to intentional child abuse. Even without the responsibilities of raising a child, George and Debbie would face certain difficulties simply because they are immature and unsophisticated. To be sure, it is conceivable that their other burdens may result in some deficiencies of care. It is, at this point, however, conjectural to state that the possibility of such neglect is so great as to render the child presently deprived.

Because the record does not sustain the lower court's finding of "clear necessity" to remove appellant from the custody of his parents, the lower court's order of October 15, 1975, was erroneous. Normally, we would reverse and order that the child be given to the parents. However, the court's opinion, written in March, 1976, refers to evi-

dence produced at a hearing held on November 26, 1975, and to facts learned by the court subsequent to that date. These factors bear heavily on the issue involved in this appeal. Although not strictly "evidentiary," in view of the serious matter before us, they cannot be ignored. Therefore, we shall remand to the court below with directions to hold a further hearing so that the record may be brought up to date, and the petition considered under the standard required by law.[4]

Order reversed and case remanded.

PRICE, J., files a dissenting opinion.

PRICE, Judge (dissenting).

As I perceive the sole issue before this Court to be whether or not there were sufficient *facts* in the record to support the lower court's finding of deprivation, I must dissent from the majority's conclusion. This record amply supports the lower court's conclusions and the *facts*, as found and properly applied by the lower court, are more than sufficient to find from clear and convincing evidence that the child is deprived.

I would not quarrel with the majority's summary of the record, and I concur in those portions of the majority opinion designated as Section I and Section II.

I disagree with, and dissent from, all of that portion designated as Section III.

The order of the lower court should be affirmed where the lower court applies the proper standard in evaluating

4. At the November 26, 1975 hearing, the court was informed that Debbie and George attended the Parental Stress Center only sporadically. Further, the court's opinion alludes to the facts that George and Debbie have lost their apartment, Debbie is again pregnant, and George has been seen in possession of a gun. Further, we cannot ignore the fact that at the November 26, 1975 hearing, counsel for the child stated "No, not now. No one's asking for the return of this child to the home." Because the only order on appeal is the one entered October 15, 1975, we feel compelled to remand for further proceedings.

the evidence and the proof is clear and convincing that the child is without proper parental care. Since I am convinced that these criteria are met, I believe the order of the lower court should be affirmed.

Appellate review in cases of deprived children must be complete and of the broadest scope. That is not to say, however, that by the use of word-play an appellate court should substitute its judgment for that of the lower court. We have previously recognized the distinction between clear necessity occasioned by the inability of parents to provide proper care and the best interests of the child in determining the question of custody. We have also commented upon the fact that as a matter of logic the two concepts are intertwined. The majority would hold the lower court to a standard of perfection absolutely impossible to achieve. This standard is but another step in the search for perfect justice, a quest that is resulting in increasingly confusing and contradictory results in our courts. It is a quest that is decreasing the effectiveness and validity of our whole judicial process.[1] There is no perfect trial.

The majority concludes that the lower court improperly applied the best interest test. I conclude that it properly applied the clear necessity test. Of course the juvenile court judge discusses the interest of the child. How could it be avoided? But equally clear is his holding of clear necessity. I am satisfied that the proper test was applied, and that under that test the evidence was clear and convincing. And in the matter of judgment I am not willing, nor do I believe we should, freely substitute our judgment for the lower court. The majority is not so constrained. So be it!

I would affirm the order of the lower court.

1. For examples of the adverse consequences of current legal doctrine on the American courtroom see "The Price of Perfect Justice" by Macklin Fleming.