368 A.2d 780
In the Interest of Stephanie CLOUSE,
a minor.

Appeal of John CLOUSE and Mary Clouse.

Superior Court of Pennsylvania.

Argued April 20, 1976.

Decided Dec. 15, 1976.

William G. Staton, McKeesport, for appellant.

James A. Esler, Asst. County Sol., Alexander J. Jaffurs, County Sol., Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE and VAN der VOORT, JJ.

SPAETH, Judge:

This is an appeal from the order of the lower court refusing to return a child to her natural parents and continuing custody of that child with her foster parents. We affirm. The hearing judge correctly defined the legal issues; he had a fully developed record; and he has submitted a comprehensive opinion discussing the evidence and explaining his findings and conclusions. As it happens, I agree with him; but even if I did not, we should affirm, for we must defer to a judge who has seen the parties and has a more sensitive feeling for the case than we can possibly achieve simply by reading the record.

I

In defining the legal issues, the hearing judge did not have the benefit of our recent discussion in *In re LaRue,* 244 Pa.Super. 218, 366 A.2d 1271 (1976). However, the judge did very well without us, for he arrived at sub-

stantially the same definition of the issues as we did in *LaRue*.[1] It is unnecessary to repeat what was said in *LaRue;* for the reasons there stated, the issues may be summarized as follows:

First, the hearing judge had to determine whether, by "clear and convincing" evidence, Stephanie was a "deprived" child. The Juvenile Act, 11 Pa.C.S. §§ 50–102(4), 50–320(c). If the judge decided that Stephanie was not deprived, he should return her to her parents. *See LaRue.* If the judge decided Stephanie was deprived, he had to determine whether it was "necessary" to separate Stephanie from her parents. 11 Pa.C.S. §§ 50–101(b)(3), 50–321. *In re Adoption of R. I.,* 468 Pa. 287, 361 A.2d 294 (1976); *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974); *Rinker Appeal,* 180 Pa.Super. 143, 117 A.2d 780 (1955).

## II

Here, the hearing judge decided that Stephanie was deprived, and that it was necessary to separate her from her parents. Before reviewing these findings we must consider whether in a procedural sense they were properly made.

██ In a child custody case, the hearing judge should receive evidence from all interested parties, and the child should be represented by counsel, for the child's interest may be distinct from any other party's. *Stapleton v. Dauphin County Child Care Service, supra.* The judge

---

1. At the very end of his opinion, the hearing judge based his decision on the alternative ground that it was in the best interest of the child. Slip Opinion of lower court at 16–18. For the reasons that we have discussed in *LaRue,* the best interest test is not appropriate here. *LaRue,* however, is the first case that expressly says this. It was therefore natural for the hearing judge to consider how the case should be decided by the best interest test. His opinion makes clear that he did not himself regard that test as appropriate, but he could not know what we might do on appeal.

should also receive evidence from objective, disinterested witnesses. *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976). His inquiry should be comprehensive and searching, and his decision supported by a full discussion of the evidence. *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973).

If the hearing judge does not comply with these requirements, on appeal the case will be remanded for further proceedings. This is because "in child custody cases [the scope of our review] is quite broad and, while we cannot nullify the fact-finding function of the hearing judge, we are not bound by a finding which has no competent evidence to support it." *Commonwealth ex rel. Morales v. Morales,* 222 Pa.Super. 373, 376, 294 A.2d 782, 783 (1972). *And see Gunter v. Gunter, supra,* and cases there cited and discussed. Conversely, however, if the hearing judge does comply with these requirements, on appeal we must defer to his findings. Thus, in *Clair Appeal,* 219 Pa.Super. 436, 281 A.2d 726 (1971), the hearing judge "held a comprehensive hearing," "compiled an extensive record," *id.* at 437, 281 A.2d at 726, and made careful findings. Affirming, this Court, by Judge Cercone, said:

> Of course, an appellate court must always give great weight to the opinion of the trial judge who has the opportunity to see and hear the witnesses and judge their credibility and talk to the children involved.

*Id.* at 438, 281 A.2d at 727.

*Accord: Commonwealth ex rel. Doberstein v. Doberstein,* 201 Pa.Super. 102, 192 A.2d 154 (1963) (decision on custody "surely should remain in the discretion of [hearing judge] . . . [he] being in the best position . . .." Watkins, J.); *Commonwealth ex rel. Dinsmore v. Dinsmore,* 198 Pa.Super. 480, 182 A.2d 66 (1962) (appellate court "should give great weight to the opinion of the hearing judge . . . [who] is in a much better position . . .." Watkins, J.).

In the present case, there can be no question that the hearing judge has fully met the responsibilities imposed upon him. He made his findings only after a full hearing. Four separate counsel appeared and participated in the hearing: one represented Stephanie, one her parents, one the foster parents, and one the child welfare agency. Two representatives of the child welfare agency testified —both of them intimately familiar with the case—and Stephanie's mother and father, and her foster mother and father, each testified. Following the hearing, the judge filed an opinion notable for its extensive (18 pages) and sensitive discussion of the case. Accordingly, we must give "great weight," *Clair Appeal, supra,* to his findings that Stephanie was deprived, and that it was necessary to separate her from her parents.

### III

#### A

The Juvenile Act defines a "deprived child" in several ways. The definition pertinent here is that a "deprived child" is a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 11 Pa.C.S. § 50–102(4)(i). In determining whether Stephanie was a deprived child within this definition, the hearing judge had to decide: (1) what sort of parental care she had received from appellants in the past; and (2) what sort she would receive if appellants were given custody of her. *See generally LaRue, supra; see also* the thoughtful discussion of the authorities from a number of jurisdictions, at pages 8–11 of the hearing judge's opinion in this case.

#### 1

Stephanie has *never* received *any* proper parental care from appellants, despite the most intensive and

continuous efforts on the part of the child welfare agency. The evidence that this has been the case is not simply "clear and convincing" but overwhelming and unrebutted. The hearing judge summarized it in his opinion, and as the summary is excellent, it is reprinted verbatim, as follows:

Mary Clouse is 25 years of age and she is married to John Clouse, who is 28. Appellants are the parents of four children, Renee, aged 7, Pamela, aged 5, Joyce, aged 4, and Stephanie, subject of this appeal, who was two years and four months at the time of hearing. The three older children reside with appellants, while Stephanie resides with Mr. Thomas and Mrs. Sandra Dunmeyer, foster parents approved by Child Welfare Services.

Appellant, Mary Clouse, was formerly a ward of Child Welfare Services, who appears to have suffered from her own deprivation and the death of her mother, which occurred when she was fourteen years of age. She continued to have emotional problems up to the present time, which required treatment through the Mental Health and Mental Retardation Program in McKeesport, Pa., affiliated with the Allegheny County program.

Prior to the birth of Stephanie, an older sibling Joyce Clouse was admitted to the McKeesport Hospital and was diagnosed as a failure to thrive case secondary to maternal deprivation. Child Welfare Services received a suspected abuse report on March 23, 1972, filed pursuant to the Act of 1967, August 14, P.L. 239 —"Neglect or Injuries," 11 P.S. [§ 2101 et seq.]. At that time appellant, Mary Clouse, admitted that she had not been feeding Joyce and she was exhibiting severe depression, anxiety and hypochondriacal behavior.

On May 22, 1972, the appellants signed an Entrustment Agreement placing Joyce in the custody of Child Welfare Services. Joyce was returned to the parents on March 6, 1973.

Stephanie was born on June 2, 1973, and was never taken into her parents' care but on June 5, 1973 they signed an Entrustment Agreement placing her in the custody of Child Welfare Services. She was released from McKeesport Hospital on June 7, 1973 directly into foster care as the appellant mother felt incapable of meeting the demands of an infant. Mrs. Clouse was being treated for hypochondriasis at the Mon-Yough Mental Health Clinic and Joyce was still going through a period of adjustment in the parents' home. Stephanie was placed in the Dunmeyer foster home on July 23, 1973, where she has remained to the present.

In July, 1974, Child Welfare Services initiated plans to return Stephanie to the parents by increased visitation with November, 1974 being the time targeted for return. With the increased visitation, the mother exhibited and expressed increased anxiety and ambivalence about Stephanie's return. Her inter-action with Stephanie was poor. In December, 1974, the parents decided against the return of Stephanie as not being in the best interest of Stephanie or the family. They were concerned that they would have to change their lifestyle and that they would be required to meet Stephanie's needs, believing she would have difficulty adjusting to their ways, which are substantially different than those of the foster parents. Appellants believed this would be so because of their experience in reintegrating Joyce in the home. She finally concluded that Stephanie would simply have to adjust to her as any change she would make would cause her to regress.

Appellants at that time were willing to consider placing Stephanie for adoption. Appellant mother testified she felt that with her husband out of work they could not assume the responsibility of another child (T. p. 43). This was later repudiated, or explained (at T. 45) as being in 1973, and that the reason was she felt they were just getting on their feet, and Stephanie appeared to be so attached to the Dunmeyers. In April,

1973 after visitation was resumed, appellant mother felt unable to take Stephanie because she was having medical problems, and did not believe she could handle Stephanie (T. 46). The April visits went badly and again Appellants decided against placement and in favor of adoption. Stephanie throughout exhibited emotional disturbance as a result of the visits.

Appellant father testified that in November, 1974, his wife's nervousness increased as the time of return of the child approached (T. 61). He did not want the child back if it upset his wife (T. 63). In April it was decided not to take the child because they were in the process of buying a house and the deal had not yet gone through (T. 65). He also places his wife's health and well being above his children (T. 69). If his wife's condition regressed and Stephanie appeared to be the cause of the aggravation he would ask to have her removed (T. 70).

The Dunmeyers are foster parents to one other child besides Stephanie and they have four children of their own. In April, Appellant mother called Mrs. Dunmeyer and told her she could adopt Stephanie, but in late summer she learned Appellants had changed their minds. She states she wishes to adopt Stephanie.

Mr. Dunmeyer is a postal employee and relates to Stephanie as though she were his own child. Child Welfare advises that they have a good home and they give the appearance of mature, stable, and affectionate parents.

A letter from Mr. John Szish, M.S., Clinical Psychologist, admitted by concurrence of counsel of all parties states:

"I have seen Mary Clouse in individual psychotherapy sessions since 1970. Originally Mary was very impulsive and was at the mercy of her emotions. She has made considerable progress in becoming more aware of her emotions and showing much greater control over them. . . . . At this time it is not neces-

sary that Mary remain in psychotherapy since she is stable."

Slip Opinion of lower court at 3–6.

It does not appear that the dissent disagrees with what has been said so far, *i. e.,* that the evidence is overwhelming and unrebutted that Stephanie has never received any proper parental care from appellants. The next question, therefore, is, What sort of parental care would Stephanie receive if appellants were given custody of her?

As nearly as can be determined, the dissent never answers this question except in negative terms. Thus at the end of its opinion the dissent says, "[We are] unable to conclude that there are compelling reasons for continuing Stephanie in foster care." Dissenting Opinion 244 Pa.Super. at ——, 368 A.2d at 794. The dissent does note several facts favorable to appellants: their "financial resources will be adequate to give continued care to Stephanie"; "[t]here is no indication of marital instability"; their three older children are "in the home and well fed and well loved"; and "[a]ll of the available psychiatric evidence supports the conclusion that [appellants] have solved the problem which led to Stephanie's removal from the home and are now prepared to give her a permanent home." *Id.* The dissent never affirmatively states, however, that if appellants were given custody of Stephanie, she would receive from them proper parental care.

This may well be a misreading of the dissent's opinion; it is perhaps the dissent's intention to make an affirmative finding of fact that appellants would give Stephanie proper parental care. If that is the case, it would seem that the dissent has simply substituted its finding of fact for the hearing judge's. In the opinion of the hearing judge, the evidence was clear and convincing that appellants would not give Stephanie proper parental care. Again, the judge's opinion needs no improvement, and we shall therefore simply repeat it. It is as follows: .

On several occasions visitation with Stephanie was attempted, producing anxiety and emotional upset for

the mother and the child. On two occasions, the parents agreed to permit the foster parents to adopt Stephanie. As late as the day of the hearing, Appellant mother was indicating her ambivalence. The day before she indicated to Mrs. Mary Jayne Mulroy, Caseworker for Child Welfare Services, that she wanted to go along with the adoption (T. 4). Appellant father seems intent on having his child returned and it is the impression of the Court that Mrs. Clouse is now firmly requesting return of Stephanie because of the desire of Mr. Clouse.

Both Mr. and Mrs. Clouse acknowledge that Stephanie lives in a considerably different emotional environment than their own and that substantial adjustments would have to be made. At various times they indicated a reluctance to change their life style and resolved that Stephanie would need to make the adjustment.

Appellant father also testified that his interest in his wife was superior to his interest in his children and that if Stephanie presented a problem resulting in the regression of his wife, he would ask for Stephanie's removal.

The total record in this case presents a picture of substantial personal and family dysfunction over many years. While there is greater stability now than in the past, the attempts at establishing a parenting relationship with Stephanie invariably produced sufficient stress and anxiety on both the mother and child to result in termination of visitation and moves toward relinquishment for adoption.

The fact that other children in the home appear to be adjusting satisfactorily does not mean that a child who has never been in the home and who has a different set of adjustment patterns, will do likewise.

The ambivalence is obvious and unresolved. This court attempted to provide a further opportunity to

explore the establishment of this relationship, but Appellants elected not to proceed in that manner but rather to have the matter resolved on appeal.

The evidence to this court is clear and convincing that the family functioning of appellant is not sufficiently stable to provide for the proper emotional care necessary for the emotional health of Stephanie. Integrating Stephanie in the home of her parents, who have shown such ambivalence toward her return, with the strong likelihood that if the effect was detrimental to the mother, that Stephanie would be removed, places all of the risks, trauma and adjustment requirements on a 2½ year old child. The appellants have given Stephanie nothing in her young life and they now require her to carry the impossible burden of a satisfactory transition into their family. To rip this child from the warm, loving and stable embrace of the only family she has known, her foster parents who express a desire to adopt her, would be unconscionable.

Slip Opinion of lower court at 11–13.

## B

It follows from the foregoing that Stephanie was a "deprived" child. The only remaining question, therefore, is whether it was "necessary" to separate her from appellants—or, more accurately, the question is: Since the hearing judge has found that it was necessary to separate Stephanie from her parents, and since he arrived at that finding after the most careful procedure, should we not defer to that finding? [2]

In *LaRue, supra,* we discussed the sort of inquiry the hearing judge should make in deciding whether it was

2. The dissent never asks this question, for it defines the legal issues differently than we do. This difference is discussed in *LaRue, supra.*

necessary to separate a deprived child from her parents. There we said, 244 Pa.Super. at 230, 366 A.2d at 1277 (1976) :

> Many factors must be taken into account. Among them should be: the age and mental development of the child; the extent to which a relationship with its parents has been preserved, and the nature of that relationship; the extent to which a relationship with the child's foster parents has been established, and the degree to which that relationship has become like that of a natural family.

Here, the hearing judge took all of these factors into account. Having done so he found it clear—and the record supports him—that Stephanie enjoys a healthy and natural relationship with the Dunmeyers, her foster parents, and an unhappy and strained relationship with appellants.

Again it does not appear that the dissent disagrees. Rather, the dissent hopes that if appellants are given custody of Stephanie, matters will improve. The record, however, does not afford a sufficient basis for this hope —or, again more accurately, the hearing judge was not in error because the evidence persuaded him that there was little substance to the hope.

The critical point that the dissent overlooks is that appellants do not want Stephanie except on conditions that may do her great harm.

Stephanie's mother *says* she wants Stephanie, but her actions belie her words. Twice she wanted Stephanie adopted; *the day before the hearing* she wanted her adopted. This ambivalence is hardly surprising. Her past experience has not only made her afraid of what will happen if she has Stephanie, but has seriously undermined her confidence in her ability to cope with the problems she fears will arise. She recognizes that Stephanie regards her as a stranger and is unhappy with her; that the Dunmeyer home is very different from hers, and that Stephanie is happy there; and that she

has herself had serious psychological problems in the past. Consider this answer to her attorney, when he asked whether she felt incapable of caring for Stephanie:

A. No, I do not feel that I am incapable. What I'm saying is, I just hope the child will be capable you know, being able to stay with me. You know, I would change for the child, probably. I would have to make some changes, and I'm hoping that the baby will, too. That has been the problem. I've just been so frightened that I cannot be like Sandy. If I act like her for a little while, eventually I'm going to return to myself again, so I'm going to have to be like myself to this baby as soon as she comes home, because she's going to have to accept me if she comes home, and I cannot pull no punches with children because they're going to catch on. Children catch on right away. But I feel capable of taking care of her and putting up with it. If I really put my mind to it like I have been, I believe I can do it. (N.T. 39)

This is deeply affecting. One would like to believe that Stephanie's mother has the ability to care for Stephanie, but the evidence seems strongly against finding that she does. A mother who really wants her child would never say that if the child comes home, "she is going to have to accept me."

Assume, however, that Stephanie's mother *if left to herself*, might somehow find within herself the resources to raise Stephanie; the fact is, she will not be left to herself, for she is married to Stephanie's father; and for me, the father's testimony removes any doubt about what our decision should be. The father acknowledged that in November, 1974, he had not wanted Stephanie at home, saying that "[m]y wife['s] . . . nerves were still not what they should have been." (N.T. 61.) His wife's problems steadily decreased, however, he said, and by April, 1975, he and his wife wanted Stephanie back, only delaying her return because of delays in buying a new

house.  By October, 1975, the date of the hearing, he said
that his wife was "completely well."  (N.T. 63.)  There
then ensued the following exchange with the hearing
judge:

BY THE COURT:

Q.  I feel the distinct feeling that your testimony con-
cerning this April situation is different than your
wife's.  She said that she was sick and she didn't feel
up to taking the child back.

A.  She was, she had personal things.

Q.  But your answer was different.  You're saying
that you were trying to get a house and it didn't come
through, and you didn't feel that  .  .  .

A.  That was part of the problem, yes.  There was a
number of things.  There was no one single factor.

Q.  A second point that I would like to ask you about is
that you seem to put your wife's well-being and health
above everything else, is that true?

A.  Yes, I do.

Q.  And do you put her health and well-being above
Stephanie?

A.  Yes, that's why the baby is in the foster care now.

Q.  Now, say this child is back and your wife can't
manage her, and she becomes distraught and nervous.
Say that she has a breakdown or some other kind and
as a result, Stephanie begins to suffer.  What are you
going to do about that?

A.  Well, as I stated, none of my children have ever
suffered.

Q.  Well, Stephanie's a different child.

A.  I know it would be strange for her, coming in.
But I don't think my wife—I think my wife is beyond
her nervous  .  .  .

Q.  We can only judge the future by experience in the
past in terms of what our expectations are, and that's

what we're trying to do. We're trying to protect [sic; "project"?] in the future what is good for this child. Now, if there comes a point where your wife is more or less set up against the good of Stephanie, how are you going to decide?

A. You mean if the baby were sent back to the home and my wife would regress?

Q. Sure.

A. Well, my wife—I don't know, the baby would be back. I don't see any problem why my wife would regress. I know you have to expect it, but I can't answer that because I can't see it.

Q. Say I return the child today, and three months from now there's a problem and Stephanie seems to be part of the aggravation? Would you want Stephanie removed?

A. If Stephanie was the sole condition of the aggravation, yes.

(N.T. 68–70.)

Again, this is deeply affecting. However, one cannot help but share the hearing judge's opinion of what is likely to happen if Stephanie is returned to appellants. Stephanie will have great difficulty accepting the drastic change. The resulting tensions will lead to a recurrence of the mother's emotional difficulties. The father will react by expecting Stephanie, not much more than an infant, to adapt to her mother, rather than expecting the mother to adapt to Stephanie. Sooner or later there will be discussion about whether perhaps after all it would not be better if Stephanie were adopted.

It is difficult to imagine a more shattering experience for a child. Surely—the dissent cannot doubt—Stephanie will learn—she will be told—that if she does not adapt to her mother's ways—so different from anything she has known—she will be sent away.

In *LaRue, supra,* it was pointed out that the fundamental decision the hearing judge must make in deciding whether it is necessary to separate a deprived child from her parents is whether the "natural family [is] able to afford [the child] the security and love it needs." 244 Pa. Super. at 231, 366 A.2d at 1278. Therefore we find, with affectionate respect for our colleagues in the dissent and with sorrow that appellants find themselves in so difficult a position, that the more persuasive conclusion is that Stephanie's family is not able to afford her security and love. To return Stephanie to her parents would represent a great unkindness, mostly to Stephanie, but to her parents too, who would some day regret what they would do to her.

Order of the lower court affirmed.

PRICE and VAN der VOORT, JJ., concur in the result.

HOFFMAN, J., files a dissenting opinion in which JACOBS, J., joins.

HOFFMAN, Judge, dissenting:

This appeal presents a difficult situation in which natural parents seek to regain custody of a child whom they had previously entrusted to the care of a social service agency. Following a hearing, the lower court ordered that placement be continued in the foster home, but that an intensive effort be made to establish a relationship between the child and her natural parents. I would reverse the order of the lower court because I believe that the evidence of deprivation is not clear and convincing and because there are not compelling reasons for continuing the child in foster placement.

The subject of this appeal is Stephanie Clouse, now three years old. Her parents, Mary Clouse, twenty-five, and John Clouse, twenty-eight, have three other children: Renee, seven; Pamela, six; and Joyce, five. The three older children live with their parents. Child Welfare Services of Allegheny County ("CWS") assumed custody of Stephanie under an entrustment agreement signed by

the. Clouses on June 5, 1972. On July 23, 1973, CWS placed Stephanie in the home of Thomas and Sandra Dunmeyer, where she has remained until the present. In August, 1975, the Clouses revoked the entrustment agreement and requested Stephanie's return. CWS filed the instant petition on September 16, 1975, seeking to retain legal custody of Stephanie; a hearing was held on October 15, 1975, at which the following facts were established.

CWS's initial contact with the Clouse family occurred in March, 1972, when McKeesport Hospital reported that Joyce Clouse had been admitted to the hospital and diagnosed as a "failure-to-thrive" child. On May 22, 1972, the parents signed an entrustment agreement placing Joyce in the custody of CWS. At this time, Mrs. Clouse was suffering from severe emotional and psychological problems, which required intensive therapy and which prevented her from adequately caring for Joyce.[1] On March 6, 1973, Joyce was returned to her family. Although there were some initial difficulties, the caseworker assigned to the Clouses, Mrs. Mulroy, testified that the family made a satisfactory adjustment to the return of the child despite Mrs. Clouse's continued psychiatric difficulty. Mrs. Clouse testified that two days after Joyce's return, Mrs. Clouse's brother died which made her very depressed. Consequently, when Stephanie was born on June 2, 1973, Mrs. Clouse felt that it would not be in Stephanie's best interests to take her home: ". . . I felt at that time with my brother's death—which was very hard because I lost my mother when I was fourteen, . . . and there was no other family—I thought I had lost just about everything, and I figured I needed time to get over this, and I felt at that time there was no way I could bring a child home and subject her to

1. Mrs. Clouse's psychiatric difficulty apparently dates back to the time of her mother's death when Mrs. Clouse was fourteen. Her problems were characterized as extreme depression and hypochondriasis. She began therapy in 1970.

my depression and my anxiety that I was suffering through from my brother's death. And then doing the best I could with the fact that Joyce had been returned just two days before my brother had died, and I felt, 'I am not going to let the same thing happen to this child as I did to Joyce.' "

The Clouses signed an entrustment agreement which placed Stephanie in the custody of CWS three days after her birth. On July 23, 1973, CWS placed Stephanie with the Dunmeyers. During the first year of foster care, CWS scheduled monthly visits with the Clouses, but Stephanie became so upset that CWS found it necessary to have Mrs. Dunmeyer attend. Later, Stephanie would not cry if the foster parents were not present, but was much quieter and more passive than she was at the Dunmeyer home. In July, 1974, CWS began to explore the possibility of returning Stephanie to the Clouses. A tentative return date of November, 1974, was agreed upon, and CWS increased the number of visits to twice per month. Mrs. Mulroy testified, however, that "as the plan for her return began to materialize, the parents began to verbalize increased anxiety and ambivalence. . . . In December of 1974, the parents felt that the return of Stephanie did not seem to be in either her best interest or the interest of the family, and at that time [a] plan to refer the parents to the Adoption Department was initiated." The Clouses, however, again decided that they would consider a plan for Stephanie's return. CWS again agreed that Stephanie could be returned, and the parties set April, 1975, as the target date.

In preparation for Stephanie's return, CWS again began an intensive visitation program. In order to facilitate Stephanie's adjustment to her natural parents, CWS scheduled the visits at the Dunmeyer home, because they believed Stephanie would be more receptive in a familiar environment. Following several visits, CWS scheduled Stephanie's return for April 21, 1975, and had Stephanie stay in the Clouse home from April 15th to April 17th.

Mrs. Mulroy testified that "at the end of this two-day visit, both Stephanie and the mother appeared to be physically and emotionally upset, and at that time, the parents again decided to proceed with adoption. They were referred to the Adoption Department again . . ·." Once again, however, the Clouses decided not to pursue adoption and informed CWS on June 17, 1975, that they had abandoned any plans to have Stephanie adopted. The Clouses had no further contact with CWS until August, 1975, when they revoked the entrustment agreement and requested that Stephanie be returned.

The record clearly establishes that the Dunmeyers have provided Stephanie with excellent care and have become her psychological parents. Stephanie views the Clouse as strangers and has experienced difficulty in relating to them. Mrs. Mulroy testified that "[i]nitially, she'd refused to relate to them at all. At this point we brought the foster parents into the visits and had them stay with Stephanie just so she could be calmed down. . . . She still was fairly anxious, but we worked this out so that she was able to relate to them minimally. However, when she went for the overnight visit, Mrs. Clouse related to me that the difficulties they experienced were on one occasion she took Stephanie for a walk. Stephanie saw a home that resembled the foster parents' home. She walked up to the porch, and she was crying and very upset, evidently relating this home to the foster family." Mrs. Clouse's own testimony acknowledged that Mrs. Dunmeyer had been an excellent mother and that Stephanie had developed a bond with her. Additionally, Mrs. Clouse very candidly stated that "[i]t's going to be very difficult, being that she hasn't seen me in all these months, it's going to be difficult. I'm going to have to accept the fact that right now I am no more than just a stranger in my child's life, and she is going to be, I guess, as any chiild would be, really frightened of the outcome, until she starts getting used to the fact that my

husband and I are her parents and we're there when she needs us, and she doesn't have to be afraid."

Mrs. Clouse testified that her previous ambivalence was the product of her physical and emotional illnesses combined with her concern for Stephanie's welfare: "After I visited the Dunmeyer home and I had seen the baby . . . having fun, and I felt that she at that time was so relaxed and felt so at home. And I only felt at the time that I wanted what was best for the child. I did not want to bring her home, as what resulted from the visits I had seen, I figured, 'Well, when she comes home, it's going to be the same way, and it might give her an emotional scar for her life. Even as little as she is, she'll realize this.' And I seen another thing. Mrs. Dunmeyer, at the time in her home—Her home is all together different from my home. We have completely different homes. Their home is softspoken, seems like it's very happy and softspoken. Our home is happy, but we are far from softspoken people. We are go-getters, and our children talk loud, and we talk loud, and I didn't know how Stephanie would adjust to that . . . ." She did testify, however, that she was completely recovered from her prior illnesses, and for the first time, felt deeply committed to having Stephanie returned. Mr. Clouse testified that his ambivalence stemmed solely from concern about his wife's physical and emotional health: ". . . I did not want her to regress to a period where she would have to go back weekly to see a psychologist. But she's overcome that now, and there's no reason that I can see why the baby shouldn't be home now." He did admit, however, that if Stephanie's return created a deterioration in Mrs. Clouse's health, he would have Stephanie adopted.

Mrs. Clouse also expressed her dissatisfaction with the visitation program adopted by CWS: "I do not believe in this preplacement business where she comes home for a while and goes back because this is very serious. This is why my husband and I stopped the visits. As you can

see we haven't seen the baby for about three or four months now . . .. I don't care if the baby comes home for twenty-eight days to stay with us. She goes back to that home, she's going to remember this woman as the woman who took care of her. She cannot be a ball and bounce back and forth. We had to either stop it by adoption, or stop it by bringing her home. And we felt that our children is the only thing my husband and I have. We have no family, we only have our children. And we feel that in our lifetime we're going to give our children all we can give them, because we never had."

It is clear that the Clouses' previous attitude regarding Stephanie's return had been ambivalent. Mrs. Mulroy described their conflicting feelings: "Mrs. Clouse feels that the Clouses probably are not going to change their lifestyle that much, and if Stephanie's going to adjust to their home, it has to be on her part. She feels some problem may arise. Should in six weeks or two months Stephanie not have adjusted to their home, what is going to happen at this point. This is her feeling negatively about having Stephanie coming home. The positive feeling that she has about Stephanie's coming home is that she feels when Stephanie grows up should she be adopted, Stephanie is going to come back to her and say, 'Why didn't you take care of me? You were my parents.' I think these are the kinds of feelings they were going through." In view of their previous vacillation, Mrs. Mulroy expressed doubt about the strength of the Clouses' commitment: ". . . Mr. and Mrs. Clouse have to make a commitment now that they are going to see it through, and that if in six weeks Stephanie has not adjusted, that they could not return her to the Dunmeyer foster home. . . . I don't know that they are willing or able to say that." She also cited the possibility that Mrs. Clouse would probably experience great difficulty in relating to Stephanie, if the child failed to make a rapid adjustment.

Despite Mrs. Mulroy's concern for Mrs. Clouse's future stability if she encountered problems relating to Stephanie's return, the only evidence concerning her present emotional condition was her own testimony and a letter from her psychologist which was admitted without objection. The court summarized the psychologist's opinion for the record: ". . . let the record show that Mr. Szish's letter would support what Mrs. Clouse has said about a definite improvement in her ability to manage problems, control her own emotions and impulsiveness. At this point, he doesn't believe that she's in need of psychotherapy." Mrs. Mulroy did, however, admit that Mrs. Clouse's psychiatric difficulties did not impair her ability to care for the other three children currently residing with her. She testified that they were well cared for, and expressed the opinion that Mrs. Clouse was perfectly capable of seeing to Stephanie's physical needs.

At the close of the hearing, the attorney appointed to represent Stephanie's interest[2] expressed his opinion that Mrs. Clouse's view of the effectiveness of visitation was essentially correct, and that the worst solution would be a continuation of the status quo: "I don't think that a continued existence, going back and forth the way it's been going now, is going to help this child at all, if every six months, a year, this same thing comes up. This child's going to have severe emotional problems. I think if this child is going to be returned, there has to be a great conscientious effort made at this time to have that child returned. And if not, then I think perhaps this thing should be referred to Orphans' Court for adoption proceedings to be pursued."

At the conclusion of the hearing, the lower court ordered that placement be continued in the foster home,

---

2. The Juvenile Act, Dec. 6, 1972, P.L. 1464, No. 333, § 20; 11 P.S. § 50–317.

but that an intensive effort be made to establish a relationship between the child and her natural parents through an accelerated program of visitation. The lower court made two findings. First, it determined that Stephanie would be a deprived child if returned to the Clouses; second, it concluded that Stephanie's welfare would best be promoted by continued placement in the Dunmeyer home combined with a concerted effort by CWS to establish a relationship between Stephanie and her natural parents. It reasoned "[t]he foster parents . . . are the only parents Stephanie has known. As between the foster parents and the natural parents, present physical environment, wealth and material things are not at issue. The life styles of the two families is considerably different. The approach to child rearing is admittedly different with Appellant father admitting that his wife screams at the children more than most parents, whereas the Dunmeyers are much quieter and exercise better supervision and control. They also acknowledge that Stephanie fits into the Dunmeyer family very well, whereas they can only speculate with some concern as to her place in their family. Mr. Clouse places his wife's well being above Stephanie's and to protect the stability of his home, he is probably justified. Mrs. Clouse's ambivalence is extremely pronounced and despite her firm statements of intent to have Stephanie come to her home and to remain, the stress, anxiety and instability presently exhibited by this transition, saturates the case. *The Court feels Stephanie's bests interests would always be secondary to that of Mrs. Clouse and the pressure on her to adjust would produce trauma and disturbance in her which would in turn aggravate the stress, anxiety and hypochondriasis which underlies Mrs. Clouse's personality. Stephanie would not long remain in that home.*" (Emphasis added). The lower court framed its two findings in the alternative believing that even if the evidence of deprivation were insufficient, it was free to make an award of custody by applying the "best interests" test

enunciated in *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974).[3]

I stated what I believe to be the applicable law in my Opinion in Support of Remand in *In re LaRue*, 244 Pa. Super. 218, 366 A.2d 1271 (Filed Dec. 15, 1976). In *LaRue* I stated the belief that when a natural parent has relinquished the custody of a child to a social service agency under an entrustment agreement, the court must first determine whether there is clear and convincing evidence that the child will be deprived within the meaning of the Juvenile Act [4] if returned to the natural parent. See also *In re DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976). If the court determines that the child will be deprived, the court must then determine what disposition is best suited to the protection and physical, mental, and moral welfare of the child as required by the Act.[5] If the court determines that the child will not be deprived, then it must determine whether there are, nevertheless, compelling reasons for continuing custody of the child with the foster parents.

As I stated in *LaRue*, if the court determines that the child will not be deprived, based upon prognostic evidence, it "must attempt to reconcile the important rights

---

3. In *Stapleton v. Dauphin County Child Care Service, supra,* this Court determined that after a judicial declaration of deprivation, a court should award custody based upon an analysis of the child's best interest. See also, *In re LaRue*, 244 Pa.Super. 218, 251–252 n. 12, 366 A.2d 1271, 1288 n. 12 (1976) (Opinion in Support of Remand by HOFFMAN, J.).

4. The Juvenile Act defines a "deprived child" as one who: '(i) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals; or (ii) has been placed for care or adoption in violation of law; or (iii) has been abandoned by his parents, guardian, or legal custodian; or (iv) is without a parent, guardian, or legal custodian; or (v) while subject to compulsory school attendance is habitually and without justification truant from school." Act of December 6, 1972, P.L. 1464, No. 333, § 2; 11 P.S. § 50–102(4).

5. Juvenile Act, supra; 11 P.S. § 50–321.

of the parent to custody with the interests and welfare of the child." *In re LaRue,* supra, 244 Pa.Super. at 252, 366 A.2d at 1288 (Opinion in Support of Remand by HOFF-MAN, J.) (Filed Dec. 15, 1976). I emphasized in *La-Rue* that the court must not simply compare the homes of the foster and natural parents; it must examine all relevant facts and circumstances to harmonize, if possible the competing interests of parents and child. The court will inquire into the circumstances surrounding the signing of the agreement to determine if the natural parents' rights have been abused. It will examine the efforts of the natural parents to preserve a relationship with their child and the effects of continued foster placement on the child. Lastly, it will consider the ability of the natural parents to meet the needs of the child for stability and continuity. A court must not remove a child from the custody of its parents except upon a showing of clear necessity. *See In re LaRue,* supra at 218–235, 366 A.2d 1271 (Opinion in Support of Remand by HOFF-MAN, J.). (Filed Dec. 15, 1976).

Under both statutory and case law, the scope of this Court's review in child custody cases is quite broad and, while we cannot nullify the fact-finding function of the hearing judge, we are not bound by a finding which is unsupported by the evidence. *Gunter v. Gunter,* 240 Pa. Super. 382, 361 A.2d 307 (Filed March 29, 1976); *Commonwealth ex rel. Morales v. Morales,* 222 Pa.Super. 373, 294 A.2d 782 (1972). In order to justify separating the natural parent from his child, we will require a demanding standard of "compelling" evidence. *Cf. In re Adoption of R. I.,* 468 Pa. 287, 361 A.2d 294 (Filed July 6, 1976).

In the instant case, the lower court felt that Stephanie should not be returned to the Clouses because it believed that Mrs. Clouse's previous instability and ambivalence toward Stephanie's return indicated an inability to foster the child's emotional well-being adequately. It, there-

fore, held that Stephanie would be deprived if returned to the natural parents. I cannot agree; and would, therefore, determine whether the court's order may be sustained under the tests I enunciated in *LaRue.*

The evidence of deprivation, even under the "prognostic evidence" test enunciated in *In re DeSavage, supra,* is simply not clear and convincing. Although the court below and Mrs. Mulroy, the CWS social worker, were both skeptical about Mrs. Clouse's capacity to cope with the difficult adjustments necessary to the process of reintegrating Stephanie into the family unit, the only available evidence on the subject, the letter from Mrs. Clouse's therapist, contradicts this conclusion and supports Mrs. Clouse's contention that she will be able to adjust to Stephanie's return and provide adequate care. Furthermore, it is undisputed that the Clouses' three older children are well cared for. Stephanie's older sister, Joyce, was reintegrated into the family when Mrs. Clouse was far less stable than she is now. Although the lower court deemed it significant that Mr. Clouse would not want to effect Stephanie's return if it would result in a deterioration of his wife's condition, there is simply no evidence that Mr. Clouse will be forced to make the choice between his wife's health and the return of his child. The Clouses' previous ambivalence about Stephanie's return can be clearly understood as a desire not to have Stephanie returned before Mrs. Clouse's mental health would permit. Weighing all of the evidence of deprivation, we conclude that it is simply not clear and convincing.

Having determined that the prognostic evidence of deprivation is insufficient when measured by the "clear and convincing" standard, I would determine whether there are, nevertheless, compelling reasons for continuing the child in foster care. *In re LaRue, supra.*

There is no question in the instant case that the Clouses signed the entrustment agreement voluntarily; there

is no evidence of duress or coercion by CWS. Further, CWS has attempted from the very beginning of its involvement with the Clouses to effectuate Stephanie's return. In this sense, the case is distinguishable from the factual situation in *LaRue*. The natural parents, CWS, and the foster parents all worked to preserve the possibility that Stephanie would be reunited with her parents when Mrs. Clouse's disability ceased. As I have noted, the Clouses have resisted the efforts of CWS to return Stephanie prematurely, but this cannot be construed as a lack of concern for the welfare of their child. The Clouses only wanted to ensure that Stephanie's return to them would be permanent. The Clouses also expressed an interest in having Stephanie's status resolved by adoption, but this was obviously motivated by their concern for her welfare and by their uncertainty about the speed of Mrs. Clouse's recovery.

The record supports the court's conclusion that a strong psychological bond has grown between the foster parents and Stephanie. Stephanie has been in foster care almost continuously from birth. This factor would support the continuation of foster care. There can be no doubt, therefore, that a grant of custody to the Clouses will be upsetting to Stephanie at least as a short-term proposition. On the other hand, the evidence is undisputed that Stephanie's older sister was satisfactorily reintegrated into the Clouse home, indicating the strength of the Clouse's willingness and ability to accomplish the same task with Stephanie. Joyce's return from CWS custody was achieved at a time when Mrs. Clouse's illness might have impeded the family's adjustment. With the disability removed, it may be expected that the adjustment will be easier.

I also note that the Clouse's financial resources will be adequate to give continued care to Stephanie in the future. Mr. Clouse is employed. There is no indication of marital instability between Mr. and Mrs. Clouse. The

three children in the home are well fed and well loved. ·
All of the available psychiatric evidence supports the
conclusion that Mr. and Mrs. Clouse have solved the
problem which led to Stephanie's removal from the home
and are now prepared to give her a permanent home.

Thus, weighing all of the facts and circumstances sur-
rounding the entrustment agreement, the potential ad-
verse affects on the child, and the relative abilities of the
homes to provide adequate and continuous care in the fu-
ture, I am unable to conclude that there are compelling[l]
reasons for continuing Stephanie in foster care. Were I
to resolve Stephanie's future solely on the basis of which
custody arrangement would be best suited to her needs,
as would be required if there had been a judicial find-
ing of deprivation,[6] a different result might be reached,
but I do not find that there are compelling reasons for
continuing foster care and ignoring the Clouses' rights to
custody. In the absence of such compelling reasons, I
would reverse the order of the lower court and return
Stephanie to the natural parents.

JACOBS, J., joins in this dissenting opinion.

---

**6.** See *Stapleton v. Dauphin County Child Care Service, supra,*
and Note 3, *supra.*