J-A08012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.A., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.A., MOTHER | : : : : : : | |
| | : | No. 1995 EDA 2020 |

Appeal from the Order Entered October 21, 2020
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000950-2020

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.:                **FILED MAY 05, 2021**

E.A. ("Mother") appeals from the order entered on October 21, 2020 that adjudicated her daughter, N.A. ("Child"), dependent. The court also ordered that it was in Child's best interest to be removed from Mother's home and transferred legal custody to the Philadelphia Department of Human Services ("DHS"), with placement to remain in kinship care. On appeal, Mother challenges the trial court's determination: (1) that Child met the definition of a dependent child, (2) that Child be removed from Mother's care, and (3) that DHS made reasonable efforts to prevent or eliminate the need for removal. After careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

In August 2020, DHS received a General Protective Services ("GPS") report after Mother had given birth to Child. The report laid out Mother's extensive history with DHS, including that her rights to all of her previous children had been terminated, and that the children had all been adopted. It also detailed that Mother had a history of mental health concerns and had been diagnosed as suffering from bipolar disorder and detachment disorder when she was a teenager. Regarding her current situation, the report alleged that Mother had tested positive for marijuana in the beginning of her pregnancy with Child but tested negative for substances at subsequent prenatal appointments and at the time of admission. Finally, the report stated Mother resided in a rooming home and that Mother had alleged she was prepared to take care of Child. DHS determined the report was valid.

Child was released from the hospital directly to Kinship guardians, who were provided as a resource by Mother. Kinship guardians had adopted two of Mother's previous children.

On September 1, 2020, DHS filed a dependency petition with respect to Child. In the petition, DHS summarized the information in the GPS report and detailed its history with Mother concerning the eventual termination of her parental rights to her four previous children, between 2011 and 2016. Further, DHS detailed its visits with Mother, including visits to her home, and visits with Child at Mother's aunt's home.

The adjudication hearing was held on October 21, 2020. During the hearing, Julia Kendrick, a social worker with DHS, testified that Mother had been renting a room with a roommate, and that they did have items for the baby, including clothes and bottles, and a place for the baby to sleep. *See* N.T., 10/21/2020, at 15-16. Kendrick clarified that a clearance check was run on Mother's roommate and his clearance "was fine." *See id*. at 16.

On cross-examination, Kendrick testified that she had contact with Mother and Child at the hospital at the time of Child's birth, and that Mother did not present any safety risk to Child at the time. *See id*. at 20. In the dependency petition, Kendrick had noted that there were substance abuse issues for Mother. In her testimony, Kendrick clarified that Mother had tested positive for marijuana once, early in the pregnancy, but that Mother tested negative for substances at later prenatal appointments. *See id*.

Next, Anna Faye, a caseworker who had been working on the case and had observed Mother, testified that she did not know if a parental capacity evaluation had been completed and that she had not ordered one. *See id*. at 24. However, she testified that she believed it would be helpful to have one completed now, since she found that although Mother cares for her child, she had some concerns regarding Mother's "cognitive functioning in her ability to handle multiple and bigger issues at once" and regarding Mother's "poor social boundaries." *Id*. at 25. As an example, Faye testified that Mother agreed to have her current roommate move in with her, and share a bed with her,

despite not knowing him previously. *See id*. Of note, had Child come home with Mother from the hospital after birth, Child would have been living in the same room with Mother and roommate.

A portion of Faye's testimony is then spent on alleged racial comments Mother had made to an ex-boyfriend, who at the time of the hearing had alleged he was the father.[1] This testimony was offered as relevant to Mother's capacity and cognitive functioning. Mother's counsel timely objected to admission of this testimony based on relevance, stating these comments did not sound like they would support such an argument. *See id*. at 26. However, the court overruled the objection, and allowed the testimony, stating "to be frank, I won't know until I hear them, so [I] am going to give a little bit of leeway." *Id*.

Finally, Faye testified that although Mother was happy to see Child during visits, and interacted with Child in a loving and caring way, Faye was concerned that Mother was spending too much time during visits video calling family members and friends. *See id*. at 35. Faye was specifically concerned about an occasion when the conversation turned inappropriately sexual with Child present. *See id*.

---

[1] The testimony also centered on concerns regarding the ex-boyfriend sending pornographic photographs of Mother to friends and family. However, as the ex-boyfriend is not a part of this appeal, and in fact has since been found not to be the father, this discussion is not relevant to our analysis. *See* Appellant's Brief, at 2, FN1.

Lastly, Mother testified on her own behalf. She explained that the comments to her ex-boyfriend were made out of anger due to the status of their relationship at the time. *See id*. at 46. She clarified that she has been seeing a therapist since shortly after she had Child and has discussed those comments with her therapist. *See id*. at 46-47. She further explained the one positive test for marijuana early in the pregnancy, testifying that before she knew she was pregnant, she had decided to celebrate getting a new job by smoking with some friends. *See id*. at 47. She clarified this is why she had tested positive early in the pregnancy and that once she found out she was pregnant she never smoked or drank for the remainder of the pregnancy and received all negative tests since the first one. *See id*.

Mother testified that she has since moved into a two-bedroom apartment and that there would be room for Child to live there. *See id*. at 48. She testified that Child would live in Mother's room for now, and when she grows up she would get her own room, since Mother's roommate was moving out soon. *See id*. She also testified that she had everything she needed for Child and had applied for and was granted enrollment in the Women, Infant, and Children (commonly known as WIC) program in order to take care of Child. *See id*. at 49-50.

By order dated on the same day, the juvenile court adjudicated Child dependent. *See* Order of Adjudication and Disposition, 10/21/20, at 1. The court found that it was in Child's best interest and welfare to be removed from

the home, and that DHS made reasonable efforts to prevent or eliminate the need for removal. *See id*. at 1-2. The court further ordered that legal custody transfer to DHS with Child's placement to remain in kinship care. *See id*. at 2. The court granted Mother liberal visitation supervised by the kinship guardians and scheduled an initial permanency review hearing for March 3, 2021. *See id*. Finally, the court stated the current placement goal for Child was to return to a parent or guardian. *See id*. This timely appeal followed.

On appeal, Mother presents the following issues:

1. Whether the trial court erred as a matter of law or abused its discretion in finding that [DHS] met its burden to prove, by clear and convincing evidence, that [Child] was a dependent child.

2. Whether the trial court erred as a matter of law or abused its discretion in finding that [DHS] met its burden to prove that it was clearly necessary to remove [Child] from her mother's care.

3. Whether the trial court erred as a matter of law in making the pre-placement finding required by 23 Pa.C.S.A § 6351(b)(2) of the Pennsylvania Juvenile Act, by determining that [DHS] made reasonable efforts to prevent or eliminate the need for the removal of [Child] from her mother's care.

4. Whether the trial court erred as a matter of law by allowing the admission of and relying on inadmissible evidence.[2]

---

[2] While Mother presents this issue as a distinct issue in her statement of questions involved, in the argument section of her brief, Mother abandons this claim as a distinct issue, instead only making limited reference to this claim in the discussion of her first issue. An issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived. *See Commonwealth v. Rodgers*, 605 A.2d 1228, 1239 (Pa. Super. 1992). As Mother failed to adequately develop the matter presented in her statement of questions presented, we find it waived. *See Commonwealth v. Williams*, 732 A.2d 1167, 1175 (Pa. 1999) (noting relief is unavailable based upon
*(Footnote Continued Next Page)*

- 6 -

Appellants Brief, at 3.

We review dependency adjudications with deference to the trial court's findings of fact, but not its conclusions of law:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Dependency matters are governed by the Juvenile Act, 42 Pa.C.S.A. § 6301, *et seq.*

> A "dependent child" is defined, in relevant part, as one who is without proper parental care or control, subsistence, education as required by law or other care or control necessary for his physical, mental or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety or welfare of the child at risk[.] The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.
>
> The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency.

---

undeveloped claims for which insufficient arguments are presented on appeal); *see also See* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part - in distinctive type or in type distinctively displayed - the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.")

*In re G., T.,* 845 A.2d 870, 872 (Pa. Super. 2004) (internal citations and quotation marks omitted); *see also* 42 Pa.C.S.A. § 6302.

Following a finding of dependency, the juvenile court may enter an order for the child's disposition pursuant to the Juvenile Act, which is "best suited to the safety, protection and physical, mental, and moral welfare of the child." 42, Pa.C.S.A. § 6351(a). In order to properly assess the proper disposition, the court must ascertain several facts:

**§ 6351. Disposition of dependent child.**

...

(b) *Required preplacement findings.*—Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:

(1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and

(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or

(3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; …

42 Pa.C.S.A. § 6351(b).

Mother's issues are related, and so we review them together. The crux of Mother's argument is that there was insufficient evidence to support the

court's determinations. Specifically, she asserts DHS failed to present the requisite clear and convincing evidence that Child was lacking proper parental care and control and whether such care and control was immediately available. Mother also argues the court failed to meet the legal standard for ordering removal of Child from her home since they did not show that removal was clearly necessary. According to Mother, even if Child was found to be dependent, DHS could have crafted a safety plan to keep Child in Mother's home. This argument leads to Mother's final argument, that the court erred in finding that DHS made reasonable efforts to prevent or eliminate the need for the removal of the Child from her home.

It is well-settled that "a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." ***In re R.W.J.,*** 826 A.2d 10, 14 (Pa. Super. 2003). In ***Matter of DeSavage***, 360 A.2d 237 (Pa. Super. 1976), this Court rejected the argument that a child cannot be adjudicated dependent unless the child is actually in custody of the parents and they are shown unable to render care or control as defined in the Juvenile Act. We explained:

> Obviously, state interference with a parent-child relationship is a most serious intrusion ... such an intrusion is properly tolerated only in cases in which the Commonwealth sustains a very strict burden of proof.... The rule of law appellants request us to announce is overly restrictive. The legislature defined ["dependent child"] in exceedingly broad terms precisely because it is impossible to foresee all the possible factual situations that may arise. Further the broad definition enables the experienced

juvenile court judge to apply his training and compassion to the unique facts of each case. The proposition asserted by appellants would compel the juvenile court judge to place the child in the home of the natural parents to determine whether they are able to render proper care, and ignores the possibility that if the "experiment" proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal.

*Id*. at 241–242.

The juvenile court stated that it found Child dependent due to Mother's history with DHS and her apparent drug use:

So based on the testimony taken for this case, I am going to adjudicate [Child] dependent. What is concerning to me is one, [Mother] has a history with DHS that has resulted in involuntary terminations of other children. Two, based on the testimony that I've heard, there are clear concerns regarding [Mother]'s mental health. And while I'm not sure - and let me clear, they are concerns that at one point there was some drug use. While mom is indicating her drug of choice is marijuana, I have no way of knowing that for sure, that's one. But two, I'm also concerned with marijuana use with a child this young because this age for a child, you need to be able to pay attention and to respond and react relatively quickly. So I am going to adjudicate dependent based on present inability.

N.T., 10/21/20, at 61. Further, the court decided to order a parenting capacity evaluation based on the fact that Mother had not known her current roommate when she invited him to live with her:

I typically don't order parenting capacity evaluations ["PCE"] at an adjudicatory, but that's very concerning to me in light of the history of this case and the fact that [Mother] has other children who were removed from her care and subsequently involuntarily terminated and thankfully who reside with [kinship guardians] such that [Child] can have contact with her siblings.

*Id*. at 63.

On the matter of whether Child should be committed to DHS, the court stated the following:

> So I am committing the child to DHS. With the commit to DHS, I will find that it's contrary to the health, welfare, and safety of the child to return to mother at this time.

*Id*. at 67-68. The court acknowledged that Mother had a new address and ordered CUA to assess the home once Mother's roommate moved out. *See id*. at 68.

We discern no abuse of discretion by the juvenile court based on the totality of the circumstances in this case and the appropriate legal principles. The testimony was sufficient to show valid concerns on DHS's behalf, bolstered by its history of involvement with Mother. DHS made an effort to observe Mother prior to the adjudicatory hearing, but still had clear concerns regarding Mother's living situation and her ability to control her mental health issues. Given the limited time period involved, it would not have been feasible for DHS to have done more prior to the adjudication hearing that would have been able to assuage its valid concerns regarding Mother. Without more testing and observation, DHS could not discern whether Mother has resolved the issues that led to the termination of her parental rights in the past. DHS was able to order additional testing, programs and observation for Mother just prior to, and after, the hearing in order to work towards the goal of reunification.

Notably, since the start of DHS's supervision, Mother has started seeing a therapist regularly and has procured housing that seems more adequate to relieve some concerns regarding her prior living situation. Further, Child was placed in kinship care, chosen with Mother's approval,[3] Mother was granted liberal visitation, and the current placement goal is for Child to return to Mother. The court will continue to review this matter at the permanency hearings, the first of which already occurred on March 3, 2021, in order to hopefully work towards the stated goal of reunification with Mother.

We find the juvenile court did not abuse its discretion. Accordingly, we affirm the order.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: *5/5/2021*

---

[3] Kendrick testified Mother was willing to allow Child to go with the kinship guardians. *See id*. at 23. DHS, therefore, did not obtain an order for protective custody. *See id*.