J-A10015-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2324 EDA 2020 |

Appeal from the Order Entered November 16, 2020
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000926-2020

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.:                **FILED AUGUST 16, 2021**

T.D. ("Mother") appeals from the order entered on November 16, 2020, that adjudicated her son, E.R. ("Child"), dependent under the Juvenile Act,[1] based on Mother's present inability to adequately care for Child. Additionally, as part of the disposition, the juvenile court ordered that it was in Child's best interest to be removed from Mother's home, and legal custody to continue with the Philadelphia Department of Human Services ("DHS") as well as placement to remain in kinship care. On appeal, Mother contends the court erred in finding that Child met the definition of dependent child pursuant to 42 Pa.C.S.A. § 6302 and in determining that Child should be removed from

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 42 Pa.C.S.A. § 6301, *et seq*.

Mother's care where there was no showing of clear necessity to remove Child. After careful review, we affirm.

The record reveals that Child is approximately one year old, born in August 2020. DHS had previous contact with Mother when they became involved with her other child, L.D. ("Half-Sister"),[2] beginning on May 17, 2020. At the time, Mother was 25 weeks pregnant with Child and Half-Sister was two years old. *See* N.T., 11/16/2020, at 22. On that date, at around 10:00 p.m., Mother took Half-Sister to the emergency room at Saint Christopher's Hospital for Children in Philadelphia, Pennsylvania with concerns for multiple injuries on the child's face. *See id.*, at 21. Based on the child's injuries, Dr. Norell Atkinson, M.D., a child abuse pediatrician, was asked to evaluate Half-Sister. *Id.*

Mother reported to Dr. Atkinson that she left Half-Sister in the care of Child's father, J.E. ("Father"), and one of his friends, J.A. ("Father's Friend"), for approximately five hours from 10:00 a.m. to 3 p.m. Mother shared the reason she left was because she was pregnant and had been vomiting blood. *See id.*, at 22. She called for an ambulance to take her to Temple Hospital. *Id.*, at 45. She expressed that Father "was not happy about having to look after" Half-Sister. *Id.*, at 22-23.

---

[2] Half-Sister shares the same biological mother as Child, but they have different fathers.

When Mother returned, she found the house was a mess and Father appeared to be high. *See* N.T., 11/16/2020, at 23. She immediately went upstairs to check on Half-Sister, who was lying in a wet puddle and her face was very red and swollen. *See id.* Mother asked Father what happened to Half-Sister; he denied that anything had occurred. *See id.*

Mother's mother suggested that it might be an allergic reaction and advised Mother to give Half-Sister Benadryl. *See id.* Mother gave Half-Sister the medication and allowed her to sleep for several hours. However, Half-Sister showed no significant change in the amount of swelling. *See id.* Mother also noticed there were now black-and-blue marks underneath the red areas, and Half-Sister had a busted lip. *See id.*, at 24. Moreover, there were blood stains on the child's mattress. *See id.* Mother again asked Father what happened, but he again denied any knowledge. Mother said they continued to fight but "due to a prior history of violence," she decided to take Half-Sister to the hospital. *Id.*

Dr. Atkinson then conducted a physical examination of Half-Sister. He observed that the child "still had some redness and swelling to her face" and she had "areas of bruising as well as petechiae bruises, which are sort of like pinpoint areas of bruising, to the face." *Id.* The examination indicated Half-Sister also had petechiae bruises to her neck and chest area, and areas of swelling to the front of her scalp. *See id.*, at 24-25.

Dr. Atkinson determined "the presence of the petechiae bruising that was on her chest, her face and her neck would not be something that a child of this age would be able to sustain accidentally, and it was concerning for a pattern of injury that you can see in the setting of kind of forceful compression of the … chest or neck area." *Id.*, at 25. The doctor also noted the compression injury indicated the child suffered from some level of strangulation or her airway was occluded. *See id.* Dr. Atkinson diagnosed Half-Sister's injuries as the result of "child physical abuse." *Id.*

DHS was immediately notified of the matter and assigned the Child Protective Services ("CPS") report for Half-Sister to Stephanie English, an DHS investigative social worker, on May 18th. The report identified Half-Sister as the victim and Father as the alleged perpetrator. In addition to setting forth the allegations describing the child's injuries, the report indicated there was a concern because Father had a history of substance abuse. *See id.*, at 39-41.

English went to the hospital and spoke with both Mother and Father. Mother disclosed the reason for her own hospital admission was that she and Father were engaged in a heated argument that included Mother complaining about Father's drug use and "that he needed to step his game up[.]" *Id.*, at 42. She indicated Father choked her, and while she was sitting on the bed, Father hit her with a pillow and used such force that she was knocked off the bed into the corner of the room. *See id.*, at 42-43. Half-Sister was sitting on the bed screaming during the altercation. When English asked how Mother got

Father to calm down, she said that she threw a chair at him, but he also ran into a wall and knocked himself out. *See id.*, at 44. Mother stated that the next morning, she woke up with stomach pains and started to throw up. *See id.* She then decided to call the ambulance.

Mother acknowledged that the couple had a history of domestic violence. *See id.*, at 45. Furthermore, Mother admitted she had a history of being diagnosed with post-traumatic stress disorder ("PTSD"), depression, and an anxiety disorder. *See id.*, at 46. She stated she had not been in treatment since June 2019, and her last prescribed medication was Celexa which she last took in May 2019. *See id.* She did not admit to having a history of drug use. *See id.*, at 45.

During English's conversation with Father, he confirmed that he was home when Mother went to the hospital and stated that he did not know what happened to Half-Sister, but he denied harming Half-Sister. *See id.*, at 49. He did not say that he left the child with anyone else while she was in his care. *See id.* Father did not inform English that he had a history of mental health issues. *See id.*, at 49-50. Based on the evidence and conversations with the parents, English determined the report to be "indicated" with Father being perpetrator. *Id.*, at 50.[3]

---

[3] On cross-examination, English acknowledged that prior to this incident, there were no instances of abuse or neglect while Half-Sister was in Father's care. *See id.*, at 52.

On May 19th, as Half-Sister was ready for discharge, DHS obtained an order of protective custody ("OPC") and placed her in a confidential setting. One day later, at the shelter care hearing, the court removed the OPC and ordered temporary physical and legal custody to DHS. Half-Sister was placed with her maternal great aunt though the Turning Points Agency ("TPA"). *See id.*, at 74.

Subsequently, Shaylin Crayder, a DHS worker, was assigned a GPS report regarding the family on August 30, 2020, after Mother gave birth to Child. *See id.*, at 58. In the report, it alleged Mother had tested positive for marijuana during two prenatal visits on April 16, 2020, and July 4, 2020, and Half-Sister was not in her care. *See id.*, at 58-59. The report also indicated Mother said she was receiving mental health treatment at Pan American at the time, and she no longer smoked marijuana. *See id.*, at 59.

Crayder met with Mother and Father at the hospital. Mother admitted that she smoked marijuana while she was pregnant[4] and stated that the only domestic violence she endured was with Half-Sister's biological father. *See id.*, at 60. She denied any current domestic violence with Father. *See id.* Moreover, Mother stated that she did not believe that Father had caused any

---

[4] On cross-examination, Crayder confirmed that Mother was in treatment. *See id.*, at 63. She also indicated she was not aware of Mother having any positive drug screens from July to September, and Child was not born with marijuana in his system. *See id.*

harm to Half-Sister and she placed the blame on Father's Friend. ***See id.***, at 60-61.

Mother also told Crayder that she had been evicted from her apartment in June of 2020 and that she had been residing with a friend, but that individual was no longer allowing her to stay there so she was now staying with another friend. ***See id.***, at 61.

Father informed Crayder that he and Mother were no longer in a relationship and that he had his own housing, which consisted of sleeping in the living room of his grandmother's home. ***See id.***, at 61-62. He also stated that he was on probation for selling drugs but denied any current illegal substance use. ***See id.***, at 61. He reported that he was diagnosed with bipolar disorder but that he was not in any treatment. ***See id.*** Based on the evidence presented, Crayder determined the report to be "valid." ***Id.***, at 62.

Crayder also went to the residence where Mother was residing at the time. Crayder noted Mother occupied one bedroom in the home, and that it was "appropriate" housing as long as they "had proper sleeping arrangements." ***Id.***, at 64.

On September 1, 2020, DHS obtained an OPC and Child was placed with his paternal great aunt through the TPA. ***See id.***, at 75. At the shelter care hearing on the following day, the court lifted the OPC and ordered temporary commitment to DHS to stand.

On September 10th, DHS filed a dependency petition with respect to Child. In the petition, DHS summarized the information in the GPS report and detailed its prior history with Mother concerning Half-Sister as well as its visits with Mother and Father. DHS indicated Child is currently under its legal custody.

On November 16, 2020, the court held a consolidated adjudicatory and child abuse hearing for both Child and Half-Sister.[5] DHS presented the evidence and testimony concerning the history of the case and the factual basis for the allegations of dependency, including the testimony of Dr. Atkinson, English, and Crayder, as recited above. Notably, Crayder expressed that DHS had numerous concerns: (1) that Mother and Father were still in a relationship; (3) that Mother did not believe that Father had harmed Half-Sister; and (3) that Mother had an unstable housing situation. *See id.*, at 65. Crayder mentioned that Mother also did not provide her with the names of any individuals identified as "supports" that could assist her with the children. *Id.*

Additionally, Tamara Sledge, the family's Community Umbrella Agency ("CUA") case manager, testified that Mother completed her parenting classes prior to the hearing and continued to participate even though she met the requirement. *See id.*, at 83. Sledge stated that while she had not received a

---

[5] Mother and Father did not testify at the hearing.

report from Mother's therapist, Mother told Sledge that she attends therapy two times a week. *See id.*, at 84. Sledge believed her agency could safely monitor the children if Father was not present. *See id.*, 86.

However, Sledge was concerned that Mother was still in a relationship with Father[6] and that Mother "may put [Child] over [Half-Sister] because [Father] is the biological father of [Child]." *Id.*, at 87. Moreover, Sledge stated that Mother has "a temper" and she could not give Mother advice without "her counter reacting, … sometimes in a negative way." *Id.*

Sledge also noted that Mother still denied that Father had abused Half-Sister. *See id.*, at 88. Mother opined that Father had cared for Half-Sister in the past and would not want to cause any harm to her. *See id.* Sledge testified that she spoke to Mother about the possibility of putting a safety plan or a court order in place so that Father would not be in the home, and Mother stated she already had a protection from abuse order for Half-Sister and she "would not lie to get any documents" against Father because he "did not do anything" to Mother nor did she believe he did anything to Half-Sister. *Id.*, at 91. Sledge recommended that Child stay with his paternal great aunt. *Id.*, at 90.

_____

[6] Sledge's fear was based on a report by a family member at a family meeting conference that Mother still visits Father at another family member's house. *See id.*, at 87.

Moreover, the court heard testimony from Robert Buckhoffer, the Community Behavioral Health representative, who testified to Mother's and Father's mental health diagnoses and therapies. ***See id.***, at 68-73. Buckhoffer stated Mother's last diagnosis was in 2005, her last outpatient therapy session was on October 26, 2020, and her last drug screening was on November 11, 2020. He indicated he did not have access to those test results. ***See id.***, at 69-70.

At the conclusion of the hearing, the court found that "clear and convincing evidence" had been presented to adjudicate Child dependent based on Mother's "present inability." ***Id.***, at 107. By order entered on the same day, the court adjudicated Child dependent pursuant to definition (1) of "Dependent Child" provided in 42 Pa.C.S.A. § 6302, and that it was in Child's best interest to be removed from Mother's and Father's homes, and legal custody to continue with DHS as well as placement to remain in kinship care. ***See*** Order of Adjudication and Disposition, 11/16/2020, at 1-2. The court also found DHS made reasonable efforts to prevent the need for removal of Child from the home. ***See id.***, at 2. It referred Mother to Behavioral Health Systems ("BHS") for a mental health consultation and evaluation and for domestic violence classes. ***See id.*** Lastly, the court granted Mother weekly supervised

visits, in person or virtually, and the placement goal for Child was to return to parent.[7] *See id.* This timely appeal followed.[8]

We review dependency adjudications with deference to the trial court's findings of fact, but not its conclusions of law:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Dependency matters are governed by the Juvenile Act, 42 Pa.C.S.A. § 6301, *et seq.* A "dependent child" is defined, in relevant part, as one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302(1).

> A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety or welfare of the child at risk[.] The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

---

[7] The court found child abuse by Father as to Half-Sister but her adjudication was deferred pending paternity test results for putative father. *See* N.T., 11/16/2020, at 106.

[8] While Father filed a participant's brief, he is not a party to this appeal. *See generally* Brief for Father, J.E., Third Party, 2/18/2021.

The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency.

*In re G., T.,* 845 A.2d 870, 872 (Pa. Super. 2004) (internal citations and quotation marks omitted). "Clear and convincing evidence" is defined as evidence "that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re J.L.C*., 837 A.2d 1247, 1251 (Pa. Super. 2003) (internal quotations omitted).

Following a finding of dependency, the juvenile court may enter an order for the child's disposition which is "best suited to the safety, protection and physical, mental, and moral welfare of the child." 42 Pa.C.S.A. § 6351(a). In order to properly assess the proper disposition, the court must ascertain several facts:

**§ 6351. Disposition of dependent child.**

...

(b) *Required preplacement findings.*—Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:

(1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and

(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or

(3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances[.]

42 Pa.C.S.A. § 6351(b).

Lastly, we note that even after a child has been adjudicated dependent, "a court may not separate that child from his or her parent unless it finds that the separation is clearly necessary. Such necessity is implicated where the welfare of the child demands that he [or she] be taken from his [or her] parents' custody." *In re G., T.,* 845 A.2d at 873 (citations and quotations marks omitted)

Here, Mother's issues are related so we review them together. Mother first contends that the court erred in finding DHS presented clear and convincing evidence that Child was dependent based on definition (1) of "Dependent Child" under Section 6302. *See* Appellant's Brief, at 19. She states that she was separated from Father and residing with a friend who passed background clearances and was willing to allow social workers in the home. *See id.* Mother also points to the following: (1) she had a room that was deemed appropriate for her and both children; (2) she was compliant with services; (3) she was attending mental health therapy; (4) she already completed a parenting class at the request of DHS; and (5) there was a PFA order protecting Half-Sister from Father. *Id.*, at 19-20. Mother argues the testimony at the adjudicatory hearing from the social workers "at best shows

that they had a fear or concerns that [M]other might not protect the child from his father," but the evidence supporting DHS's concern "does not rise to level of clear and convincing evidence of dependency." *Id.* at 20 (quotation marks omitted).

Next, Mother complains that the court erred in finding DHS presented clear and convincing evidence that there was a "clear necessity" for Child's removal from the home. *Id.* Mother argues that inadequacies in the child's home alone are not enough to place the child in the custody of a state agency and the court "must first consider if ordering a state agency to take steps to instruct the parents in the skills needed to rectify the inadequacies and providing follow up supervision in the home would allow the unity of the family to be preserved." *Id.*

Mother states DHS did not make any effort to prevent the placement of Child and he was removed from her care after birth because Half-Sister had been temporarily removed from the home due to injuries suffered while in Father's care. *See id.*, at 20-21. Mother asserts the evidence is to the contrary: (1) Crayder testified that when she removed Child, she did not ask if Mother would be willing to ensure that Father did not have contact with Half-Sister because Crayder did not believe it was an option since Half-Sister was already placed with the relative; (2) Mother and Child did not test positive for marijuana at that time of his birth, and there was no evidence that Mother tested positive after July 2020; (3) there was no evidence that Mother suffered

- 14 -

from any mental health issues that would affect her ability to care for her child; and (4) there was no evidence that Mother continued to reside with Father or that Father made attempts to live at or visit Mother's new residence. *See id.*, at 21. Mother again points to the fact that she has appropriate housing, is compliant with services, completed her requested parenting class, and attends mental health therapy.

Mother also claims that DHS's concern that Mother might not protect the children from Father is not supported by the record. She asserts that there were no previous injuries to Half-Sister while they lived with Father, DHS did not find her to be an abuser of Half-Sister, and Mother was "appropriately concerned and attentive" to Half-Sister when she took the child to the hospital. *Id.*, at 22. Mother alleges, "Nothing in testimony indicated that [she] tried to conceal the injuries to protect [Father] or any other person. Mother clearly placed the concerns for her injured child above any concerns she may have had for [Father]." *Id.* Likewise, she states:

> The fact that [M]other can not be sure whether or not [Father] or [Father's Friend] was the individual who ultimately struck and injured [Half-Sister], and while the child was left in the care of [Father] does not establish that [M]other would permit [Father] to care for [Child] or his sibling in the future. Likewise, the allegations that [M]other and [F]ather had an argument that got physical, in [Half-Sister]'s presence on one occasion while [Father] and [Mother] were living together before [Child]'s birth does [not] establish an ongoing threat of such exposure existed under the current situation where [Father] and [Mother] have separated.

*Id.*, at 23.

- 15 -

Lastly, Mother argues that the court did not make an explicit finding on the credibility of Sledge so it was unclear if the evidence she presented was the basis for any part of the court's decision. Further, the court did not address the clear necessity standard nor explain why the social work services were inadequate to permit Child to remain in her care. *Id.*

It is well-settled that "a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re R.W.J.,* 826 A.2d 10, 14 (Pa. Super. 2003). In *Matter of DeSavage,* 360 A.2d 237 (Pa. Super. 1976), this Court rejected the argument that a child cannot be adjudicated dependent unless the child is actually in custody of the parents, and they are shown to be unable to render care or control as defined in the Juvenile Act. We explained:

> Obviously, state interference with a parent-child relationship is a most serious intrusion ... such an intrusion is properly tolerated only in cases in which the Commonwealth sustains a very strict burden of proof.... The rule of law appellants request us to announce is overly restrictive. The legislature defined ["dependent child"] in exceedingly broad terms precisely because it is impossible to foresee all the possible factual situations that may arise. Further, the broad definition enables the experienced juvenile court judge to apply his training and compassion to the unique facts of each case. The proposition asserted by appellants would compel the juvenile court judge to place the child in the home of the natural parents to determine whether they are able to render proper care, and ignores the possibility that if the "experiment" proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal.

*Id.* at 241–242.

In its concise Rule 1925(a) statement, the court relied on its statements and the testimony from numerous witnesses at the November 16, 2020 hearing. Furthermore, it noted its determination that "it is in the best interest of Child to be adjudicated dependent" was also based on the "credible" testimony of Crayder. Trial Court's Notice of Compliance with Rule of Appellate Procedure 1925(a), 1/12/2021, at 1.

Our review of the record reveals that evidence supports the juvenile court's determination that Child is a dependent child, as there is evidence of conduct that places the health, safety, and welfare of Child at risk. The testimony was sufficient to show credible concerns on DHS's behalf, bolstered by its history of involvement with Mother. DHS made an effort to observe and assist Mother prior to the adjudicatory hearing, but still had valid concerns regarding the relationship between Mother and Father, her adamant denial of Father's physical abuse of Half-Sister while Half-Sister was in his care, her unstable housing situation, and her ability to manage her mental health and drug use issues.

Initially, we defer to the juvenile court's determination of credibility, absent an abuse of discretion, and discern no such abuse in the court's finding credible the testimony of Dr. Atkinson, English, Crayder, Buckhoffer, and Sledge. *In re R.J.T.*, 9 A.3d at 1190. Moreover, contrary to Mother's argument, while the court only specifically identified Crayder's testimony as credible in terms of Child's best interests in its Rule 1925(a) notice, the

inference can be made by the court's decision that it did credit testimony from all the witnesses, including Sledge.

Additionally, we find guidance in this Court's prior decisions, *In Re M.W.*, 842 A.2d 425 (Pa. Super. 2004) and *G., T.*, *supra*, with respect to Mother's handling of Father's abuse of Half-Sister. In *M.W.*, the mother of six children appealed the court's order adjudicating five of the children dependent. The remaining child, who was not involved in the appeal, had been sexually abused by the father. Mother had permitted the children to have contact with the father even after learning of the abuse. *See M.W.*, 842 A.2d at 426-427. The mother made the argument that there was no evidence the father had abused or would abuse the other children and therefore, the court's adjudication was in error.

The *M.W.* Court determined that the recent amendments to the Juvenile Act were "significantly more sensitive to the fact that siblings of sexually abused children may be without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals." *Id.*, at 429 (quotation marks omitted). The Court further opined:

> In our view, the Juvenile Act properly takes into consideration the sense of vulnerability, fear, and helplessness that siblings may feel when living in an environment where their brother or sister has been sexually abused by one parent, and the other parent (*i.e.*, the other parent who has a duty to protect the emotional welfare of the children) has taken inadequate steps to stop it. In other words, the focus is not on whether the other siblings are actually at risk of sexual abuse themselves. Rather, the key

question is whether the siblings fit the broader definition of lacking proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals. In our view, it is within the trial court's discretion to determine that siblings of sexually abused children fit that definition, even if there is no evidence that the siblings themselves will be sexually abused.

*Id.* (citation and quotation marks omitted).

In *G., T.*, this Court applied *M.W.* to a factual scenario involving parental neglect of a sibling who was not involved in the appeal. *See G., T.*, 845 A.2d at 874. The Court stated that pursuant to the Juvenile Act and *M.W.*, it was permitted to assume that any medical problem the child in the case might have developed would have been similarly ignored by the parents as they did with the sibling. *See id.*

We find the same to be true here where the underlying matter involved the physical abuse of a sibling. The court properly determined Child "was lacking proper parental care and control" because Mother lacked awareness of his sibling's needs. *See id.* Accordingly, the evidence in this case is compelling and supports the court's finding that Child qualified as "dependent" based on definition (1) of "Dependent Child" pursuant to Section 6302.

Likewise, the record supports the court's determination that Child's removal from Mother's home was clearly necessary. We conclude there is no reason to disturb the court's placement in light of physical abuse Child's sibling sustained and Mother's failure to acknowledge Father's role in the abuse, not to mention the domestic violence Mother endured by Father.

Furthermore, to the extent Mother alleges that she is complying with numerous DHS and court-ordered requests like attending parenting classes and therapies, and she was deemed to have appropriate housing, we note that given the limited period involved, it would not have been feasible for DHS to have done more prior to the November 2020 hearing that would have been able to assuage its concerns regarding Mother. This is evident by the fact that the court ordered more treatment and consultation for Mother after reviewing the evidence presented at the hearing. Additionally, it merits reiterating that Child was placed in kinship care, and Mother was granted liberal visitation with the placement goal of returning Child to Mother.

As such, we discern no abuse of discretion by the juvenile court based on the totality of the circumstances in this case and the appropriate legal principles. Accordingly, we affirm the court's adjudicatory and dispositional order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/16/2021