J-A20017-24

2024 PA Super 286

| IN THE INTEREST OF: J.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 789 EDA 2024 |

Appeal from the Order Entered February 13, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000005-2024

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and LANE, J.

OPINION BY PANELLA, P.J.E.:                    **FILED DECEMBER 3, 2024**

A.M. ("Mother") appeals from the order entered on February 13, 2024 in the Court of Common Pleas of Philadelphia County adjudicating J.M. (d.o.b. 8/2023) dependent. After our careful independent review, we affirm on the basis of the trial court's opinion.

The trial court provides a thorough procedural and factual background in its April 29, 2024 opinion.

> Mother gave birth to J.M. [in] August [] 2023. J.M. was born prematurely at twenty-four weeks gestation. Due to J.M.'s medical fragility, J.M. remained hospitalized until January 3, 2024.
>
> On November 19, 2023, [the Philadelphia Department of Human Services ("DHS")] received a General Protective Services (GPS) report alleging that Mother was not visiting J.M. at the hospital. The report alleged that Mother needed to be present at the hospital to learn how to manage J.M.'s medical needs. Hospital staff communicated to Mother that J.M. was sick. Mother responded to hospital staff but she did not visit J.M. (*See* Exhibit "A" Statement of Facts, at ¶ 5(b), attached to DHS Dependency Petition, filed 1/11/24). On November 3, 2023, a meeting was

conducted between hospital staff, Mother, and Maternal Grandmother, N.S. Mother resided with Maternal Grandmother. The purpose of the meeting was to address whether Mother and Maternal Grandmother were facing barriers in their abilities to visit J.M. Hospital staff were told that Mother was not employed or enrolled in school. Hospital staff informed Mother they expected her to visit J.M. on a daily basis. Bus passes were offered to help overcome any transportation barriers. (**See id.**).

At the November 3, 2023 meeting, hospital staff did not perceive Mother to be appropriately concerned about J.M. After the meeting, and prior to the filing of the GPS report, Mother only visited J.M. on two occasions—November 8, 2023, at 12:00 [A]M and November 14, 2023, at 10:00 PM. Hospital staff were unaware why Mother was not visiting J.M. on a daily basis and were concerned about the infrequency of Mother's visits. DHS determined the GPS report to be valid. (**See id.** at ¶ 5(c)).

DHS attempted to visit Mother at her home on November 22, 2023, but she was not there at the time. DHS visited again on December 2, 2023, and was able to speak with Mother and Maternal Grandmother to address visitation concerns. DHS asserted that, at this point in time, Mother had only visited J.M. in the hospital eight times. (**See id.** at ¶¶ 5(d)-(e)).

DHS held a Crisis/Rapid Response Meeting on December 8, 2023. Mother, Maternal Grandmother and DHS attended the meeting. DHS provided Mother with a list of training sessions that she needed to complete, including training regarding feeding, administering medications, and learning cardiopulmonary resuscitation (CPR). (**See id.** at ¶ 5(f)).

By January 3, 2024, J.M. was ready to be discharged from the hospital. At this point, Mother did not provide certification of completion of the trainings requested at the December 8, 2023 meeting. Mother only visited J.M. four times between December 8, 2023 and January 3, 2024. (**See id.** at ¶¶ 5(g)-(h)).

Contemporaneously with J.M.'s discharge, DHS obtained an [Order of Protective Custody ("OPC")] on the grounds that Mother was not visiting J.M., Mother and J.M. had not formed a bond, Mother needed to undergo training, and Mother had not demonstrated an adequate parenting capacity. As a result of the

OPC, J.M. was placed in medical foster care through Delta Community Supports, Inc. (*See id.* at ¶ 5(h)).

A shelter care hearing was held on January 5, 2024, where J.M.'s temporary commitment to DHS was ordered to stand. Mother was ordered to have twice weekly, two-hour visits with J.M. at his placement. Mother was also invited to participate in J.M.'s medical appointments. [J.M. remains medically needy, requiring follow-up appointments in cardiology, ophthalmology, and St. Christopher's Hospital for Children's Developmental Pediatrics.] (*See id.* at ¶ 5(i)-(j)).

DHS filed a Dependency Petition for J.M. on January 11, 2024. The petition asked the court to adjudicate J.M. dependent, commit J.M. to DHS, and order the disposition best suited to the welfare of J.M. The hearing on the Dependency Petition was held before this court on February 13, 2024. At the conclusion of the hearing, this court found clear and convincing evidence to adjudicate J.M. dependent. J.M. was fully committed to DHS based on the finding of present inability of Mother to provide proper parental care and control. J.M. was to remain in medical foster care through Delta Community Supports, Inc. (*See* Order of Adjudication and Disposition, 2/13/24). Mother filed her Notice of Appeal with Statement of Errors Complained on March 14, 2024.

Trial Court Opinion, 4/29/24, at 1-3 (unnecessary capitalization omitted; some record citation formatting provided)).

Mother raises five questions for this Court's review:

1. Did the trial court err as a matter of law and abuse its discretion by adjudicating J.M. to be a "dependent child" pursuant to 42 Pa.C.S.[A.] § 6302 in the absence of clear and convincing evidence that J.M. was presently "without proper parental care and control … as required by law?"

2. Did the trial court err as a matter of law and abuse its discretion by adjudicating J.M. to be a "dependent" child pursuant to 42 Pa.C.S.[A.] § 6302 and removing J.M. from his Mother's custody, and relying, at least in part, on improperly shifting onto Mother A.M. the burden to prove to the court that she can provide J.M. with proper parental care and control?

3. Did the trial court err as a matter of law and abuse its discretion by committing J.M. to the legal custody of the Philadelphia Department of Human Services in the absence of clear and convincing evidence that removal from Mother A.M. was clearly necessary?

4. Did the trial court err as a matter of law and abuse its discretion by finding that the Philadelphia Department of Human Services made reasonable efforts to prevent or eliminate the need for removal of J.M. from his home?

5. Did the trial court err as a matter of law and abuse its discretion by ordering that J.M. should be placed in medical foster care in the absence of clear and convincing evidence that medical foster care was the least restrictive placement available?

Appellant's Brief, at 3-4 (answers and suggested answers omitted).

Our standard of review in this matter is well settled:

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*Interest of R.B.*, 323 A.3d 828, 832 (Pa. Super. 2024) (citation and brackets omitted).

The Juvenile Act defines a "dependent child," in pertinent part, as a child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302(1); *see also In the Interest of J.M.*, 166 A.3d 408, 417 (Pa. Super. 2017) (same). "The question of whether a child is lacking proper parental care and control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper care or control, and if so, whether such care and control are immediately available." *In Interest of K.S.*, 159 A.3d 535, 538 (Pa. Super. 2017) (citation omitted). It is the petitioner's burden to present clear and convincing evidence, i.e., evidence that is "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of A.M.*, 256 A.3d 1263, 1270 (Pa. Super. 2021) (citation omitted). An adjudication of dependency may be based on prognostic evidence—which involves predicting the child's safety, well-being, and permanency—"and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re E.B.*, 83 A.3d 426, 433 (Pa. Super. 2013) (citation omitted).

As this Court observed in *E.B.*:

In *Matter of DeSavage*, … 360 A.2d 237 (Pa. Super. 1976), this Court rejected the argument that a child cannot be adjudicated dependent unless the child is actually in custody of the parents and they are shown unable to render care or control as defined in the Juvenile Act. We explained:

Obviously, state interference with a parent-child relationship is a most serious intrusion ... such an intrusion is properly tolerated only in cases in which the Commonwealth sustains a very strict burden of proof.... The rule of law appellants request us to announce is overly restrictive. The legislature defined

- 5 -

["dependent child"] in exceedingly broad terms precisely because it is impossible to foresee all the possible factual situations that may arise. Further the broad definition enables the experienced juvenile court judge to apply his training and compassion to the unique facts of each case. The proposition asserted by appellants would compel the juvenile court judge to place the child in the home of the natural parents to determine whether they are able to render proper care, and ignores the possibility that if the "experiment" proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal.

*Id.* at 433 (quoting ***DeSavage***, 360 A.2d at 241-42).

After reviewing the record, the parties' briefs, and the Honorable Brian McLaughlin's well-reasoned Pa.R.A.P. 1925(a) opinion, we conclude Mother's issues merit no relief. The trial court's decision belies Mother's claims that the court abused its discretion, improperly shifted the burden of proof, or failed to properly consider the evidence before it. In addressing Mother's issues, the April 29, 2024 opinion sets forth the plethora of evidence and credible, prognostic testimony that Mother's present inability to provide proper parental care and control for J.M. creates a substantial risk that J.M. would suffer detrimental or even fatal consequences if left in Mother's care. ***See*** Trial Court Opinion, 4/29/24, at 5-10. The decision also fully addresses the court's findings that DHS made reasonable efforts to prevent J.M.'s removal from Mother's home and that medical foster care was the least restrictive placement available. ***See*** Trial Court Opinion, 4/29/24, at 10-13.

We affirm on the basis of the trial court's comprehensive April 29, 2024 opinion.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/3/2024

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS ₂₀₂₄ APR 29 ᴾᴹ 12: 30

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-Dependency |
| | : |
| J.M., a Minor | : CP-51-DP-0000005-2024 |
| D/O/B: 8/23/23 | : |
| | : Superior Court No.: |
| Appeal of: | : 789 EDA 2024 |
| A.M., Mother | : |
| | : |

## OPINION

A.M. ("Mother"), Appeals from the Order entered by this Court on February 13, 2024, adjudicating J.M. dependent pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6302. In response to this Order, Mother, by and through her counsel, filed a Notice of Appeal with a Statement of Errors Complained of on Appeal on March 14, 2024.

## FACTUAL AND PROCEDURAL HISTORY

Mother gave birth to J.M. on August ██, 2023. J.M. was born prematurely at twenty-four weeks gestation. Due to J.M.'s medical fragility, J.M. remained hospitalized until January 3, 2024.

On November 19, 2023, DHS received a General Protective Services (GPS) report alleging that Mother was not visiting J.M. at the hospital. The report alleged that Mother needed to be present at the hospital to learn how to manage J.M.'s medical needs. Hospital staff communicated to Mother that J.M. was sick. Mother responded to hospital staff but she did not visit J.M. (Exhibit "A" Statement of Facts, attached to DHS Dependency Petition, filed 1/11/24).

On November 3, 2023, a meeting was conducted between hospital staff, Mother, and Maternal Grandmother, N.S. Mother resided with Maternal Grandmother. The purpose of the

1

meeting was to address whether Mother and Maternal Grandmother were facing barriers in their abilities to visit J.M. Hospital staff were told that Mother was not employed or enrolled in school. Hospital staff informed Mother they expected her to visit J.M. on a daily basis. Bus passes were offered to help overcome any transportation barriers. (Exhibit "A" Statement of Facts, attached to DHS Dependency Petition, filed 1/11/24).

At the November 3, 2023 meeting, hospital staff did not perceive Mother to be appropriately concerned about J.M. After the meeting, and prior to the filing of the GPS report, Mother only visited J.M. on two occasions—November 8, 2023, at 12:00 PM and November 14, 2023, at 10:00 PM. Hospital staff were unaware why Mother was not visiting J.M. on a daily basis and were concerned about the infrequency of Mother's visits. DHS determined the GPS report to be valid. (Exhibit "A" Statement of Facts, attached to DHS Dependency Petition, filed 1/11/24).

DHS attempted to visit Mother at her home on November 22, 2023, but she was not there at the time. DHS visited again on December 2, 2023, and was able to speak with Mother and Maternal Grandmother to address visitation concerns. DHS asserted that, at this point in time, Mother had only visited J.M. in the hospital eight times. (Exhibit "A" Statement of Facts, attached to DHS Dependency Petition, filed 1/11/24).

DHS held a Crisis/Rapid Response Meeting on December 8, 2023. Mother, Maternal Grandmother and DHS attended the meeting. DHS provided Mother with a list of training sessions that she needed to complete, including training regarding feeding, administering medications, and learning cardiopulmonary resuscitation (CPR). (Exhibit "A" Statement of Facts, attached to DHS Dependency Petition, filed 1/11/24).

By January 3, 2024, J.M. was ready to be discharged from the hospital. At this point, Mother did not provide certification of completion of the trainings requested at the December 8, 2023 meeting. Mother only visited J.M. four times between December 8, 2023 and January 3, 2024. (Exhibit "A" Statement of Facts, attached to DHS Dependency Petition, filed 1/11/24).

Contemporaneously with J.M.'s discharge, DHS obtained an OPC on the grounds that Mother was not visiting J.M., Mother and J.M. had not formed a bond, Mother needed to undergo training, and Mother had not demonstrated an adequate parenting capacity. As a result of the OPC, J.M. was placed in medical foster care through Delta Community Supports, Inc. (Exhibit "A" Statement of Facts, attached to DHS Dependency Petition, filed 1/11/24).

A shelter care hearing was held on January 5, 2024, where J.M.'s temporary commitment to DHS was ordered to stand. Mother was ordered to have twice weekly, two-hour visits with J.M. at his placement. Mother was also invited to participate in J.M.'s medical appointments. (Exhibit "A" Statement of Facts, attached to DHS Dependency Petition, filed 1/11/24).

DHS filed a Dependency Petition for J.M. on January 11, 2024. The petition asked the Court to adjudicate J.M. dependent, commit J.M. to DHS, and order the disposition best suited to the welfare of J.M. The hearing on the Dependency Petition was held before this Court on February 13, 2024. At the conclusion of the hearing, this Court found clear and convincing evidence to adjudicate J.M. dependent. J.M. was fully committed to DHS based on the finding of present inability of Mother to provide proper parental care and control. J.M. was to remain in medical foster care through Delta Community Supports, Inc. (Order of Adjudication and Disposition, 2/13/24). Mother filed her Notice of Appeal with Statement of Errors Complained on March 14, 2024.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In Mother's Statement of Matters Complained of on Appeal, she raises the following issues:

1. The trial court erred as a matter of law and abused its discretion by adjudicating J.M. to be a "dependent child" pursuant to 42 Pa.C.S. § 6302 in the absence of clear and convincing evidence that J.M. was presently "without proper parental care and control…as required by law."

2. The trial court erred as a matter of law and abused its discretion by committing J.M. to the legal custody of the Philadelphia Department of Human Services in the absence of clear and convincing evidence that removal from Mother A.M. was necessary.

3. The trial court erred as a matter of law and abused its discretion by adjudicating J.M. to be a "dependent" child pursuant to 42 Pa.C.S. § 6302 and removing J.M. from his Mother's custody, and relying, at least in part, on improperly shifting onto Mother the burden to prove to the court that she can provide J.M. with proper parental care and control.

4. The trial court erred as a matter of law and abused its discretion by finding that the Philadelphia Department of Human Services made reasonable efforts to prevent or eliminate the need for removal of J.M. from his home.

5. The trial court erred as a matter of law and abused its discretion by ordering that J.M. should be placed in medical foster care in the absence of clear and convincing evidence that medical foster care was the least restrictive placement available.

## DISCUSSION

A dependency trial is a two-stage process. The first stage requires the trial court to hear evidence and determine, by clear and convincing evidence, that the child is without proper parental care, control, or subsistence necessary for the child's physical, mental, moral, or emotional health. In re A.B., 63 A.3d 345, 349 (Pa. Super. Ct. 2013). "Clear and convincing evidence" has been defined as testimony by credible witnesses who clearly relate facts that are "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy of the truth of precise facts in issue." In Interest of J.M., 166 A.3d 408, 423 (Pa. Super. 2017) (citing In re Novosielski, 992 A.2d 89, 107 (Pa. 2010)).

4

If the trial court finds the child dependent, the trial court may move to the second stage, in which it must make an appropriate disposition based upon the inquiry into the best interest of the child. In the Interest of L.C., 900 A.2d 378, 381 (Pa. Super. 2006); *See* In the Interest of A.E., 722 A.2d 213, 215 (Pa. Super. 1998). Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined by the child's best interests. In Interest of Sweeney, 574 A.2d 690, 691 (Pa. Super. 1990). The trial court may remove a child from the care of the child's parents only upon a showing of clear necessity. In re E.P., 841 A.2d 128, 132 (Pa. Super. 2003). Before the trial court can enter any order of disposition that would remove a dependent child from their home, the court must determine that, prior to placement, reasonable efforts were made to prevent or eliminate the need for the removal of the child from the home. 42 Pa.C.S. § 6351(b)(2). The burden of proof in a dependency proceeding is on the petitioner. In re C.R.S., 696 A.2d 840, 842–43 (Pa. Super. 1997).

### 1-3. The Court's determination that DHS met its burden of proof that there was Clear and Convincing Evidence to adjudicate J.M. dependent due to absence of proper parental care and control, as well as the necessity of removing J.M. from Mother, was not erroneous or an abuse of discretion.

A "Dependent Child" will be adjudicated dependent if the trial court determines by clear and convincing evidence that Child is without proper parental care or control, subsistence, education, as required by law, or other care or control necessary for Child's physical, mental, and emotional health or morals. In the Interest of J.M., 166 A.3d at 417(Pa. Super. 2017). A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian. The Superior Court has defined proper parental care as the care which is geared to the particularized needs of the child and, at a minimum, is likely to prevent serious injury to the child. In re C.R.S., 696 A.2d 840, 843 (Pa. Super. 1997) (*citing* In Interest of Justin S., 543 A.2d 1192, 1200 (Pa. Super. 1988)).

5

The purpose of the Juvenile Act is to preserve the unity of the family whenever possible. 42 Pa.C.S. § 6301(b)(1). Nonetheless, a child will be adjudicated dependent when the child is presently without proper parental care, and the care is not immediately available. In re R.T., 592 A.2d 55, 57 (Pa. Super. 1991) (*citing* In re LaRue, 366 A.2d 1271 (Pa. Super. 1976)). A parent may not be separated from their child unless the Court finds necessity for separation, which is implicated where the welfare of the child demands a removal from parental custody. In re G. (Appeal of S.S.), 845 A.2d 870, 873 (Pa. Super. 2004).

Mother alleges that this Court ruled in error by adjudicating J.M. dependent based on Mother's present inability to provide proper parental care and control, asserting that DHS failed to present clear and convincing evidence to support that finding. This Court disagrees.

At the hearing on February 13, 2024, Maria Sierra-Ortiz, a social worker from Temple University Hospital, testified that Mother gave birth to J.M. at twenty-four weeks gestation on August ▮, 2023. (N.T., 2/13/24, p. 24). J.M. had significant medical needs and was hospitalized for the first one hundred and thirty three (133) days of his life. (N.T., 2/13/24, pp. 24-25). Ms. Sierra Ortiz testified she met with Mother on August 24, 2023 in anticipation of the challenges associated with caring for a premature baby and to ensure that Mother was prepared to raise J.M. (N.T., 2/13/24, pp. 24–25, 34). Ms. Sierra-Ortiz also testified that CPR training is essential for mothers of prematurely born infants. (N.T., 2/13/24, pp. 36).

Ms. Sierra-Ortiz testified that Mother was informed about the necessity of visiting her infant each day. However, Ms. Sierra-Ortiz testified it was later brought to her attention that Mother was not visiting J.M. (N.T., 2/13/24, pp. 25). Ms. Sierra-Ortiz testified that she initially contacted Mother over the phone regarding the reasons she had not been visiting. Mother stated

she had been sick and she intended to be coming back in for the visits. (N.T., 2/13/24, pp. 25-26).

Ms. Sierra-Ortiz testified Mother's pattern of failing to visit J.M. continued. A meeting was scheduled on November 3, 2023 to address those concerns. (N.T., 2/13/24, p. 27). Present at the meeting was Ms. Sierra-Ortiz, Mother, Maternal Grandmother, a neonatologist, and a nurse. (N.T., 2/13/24, pp. 27-28). The group assessed whether barriers were present hindering Mother's ability to visit. The medical professionals also wanted to make sure Mother was comfortable in asking any questions. (N.T., 2/13/24, p. 28).

At the meeting, Mother stated she was not employed or enrolled in any schooling. (N.T., 2/13/24, pp. 30). As to barriers for visitation, Ms. Sierra-Ortiz testified Mother stated Maternal Grandmother was her source of transportation. This source of transportation was not always reliable due to Maternal Grandmother working. (N.T., 2/13/24, pp. 28-29). Ms. Sierra-Ortiz testified that bus passes and Ubers were offered and provided to Mother. (N.T., 2/13/24, pp. 28-29). Ms. Sierra-Ortiz also testified that visitation was available "24/7". (N.T., 2/13/24, pp. 36).

Following the meeting on November 3, 2023, Ms. Sierra-Ortiz testified Mother visited J.M. only two times in the next sixteen days, each time at a late hour past 10 o'clock. (N.T., 2/13/24, pp. 30-31). This infrequency of visitation was the main concern which prompted the hospital to contact and involve DHS with J.M. (N.T., 2/13/24, pp. 41-42). Ms. Sierra-Ortiz testified the hospital needs to ensure mothers are comfortable understanding and caring for a premature baby. This was never able to take place with Mother. (N.T., 2/13/24, p. 37).

The DHS worker assigned to the matter, Sharron Burke, also testified at the hearing. Ms. Burke stated DHS received a GPS report about J.M. on November 19, 2023. The basis of the report was inadequate nurturing, which means no bond or connection between Mother and child,

7

and Mother did not demonstrate parental capacities for the child. (N.T., 2/13/24, pp. 44-45).

When Ms. Burke spoke to Mother on November 29, 2023 at a meeting at Maternal Grandmother's house, she inquired about the barriers preventing Mother from visiting with J.M. (N.T., 2/13/24, p. 47). Ms. Burke testified Mother said to her "she was sick, and that she was doing music in the studio." (N.T., 2/13/24, pp. 47-48). Ms. Burke testified she also asked Maternal Grandmother about visitations, to which she mentioned that she was also sick and her car had broken down, and she was going to get it fixed soon. (N.T., 2/13/24, pp. 49). Maternal Grandmother also mentioned to Ms. Burke that Mother had a confrontation with a hospital staff member and that was a reason Mother had been going to visit late at night to avoid that hospital staff. (N.T., 2/13/24, pp. 49-50).

Ms. Burke testified it was her understanding J.M. was born at twenty four (24) weeks and was medically fragile. (N.T., 2/13/24, pp. 50). J.M. was tiny and he needed a lot of medical appointments that needed to be attended. (N.T., 2/13/24, pp. 50). Ms. Burke stated that is why it was important for Mother to attend daily visits with J.M. (N.T., 2/13/24, pp. 50). Ms. Burke testified she stressed upon Mother, in the presence of Maternal Grandmother, that daily hospital visits were necessary. (N.T., 2/13/24, pp. 50).

Ms. Burke testified that on January 3, 2024, the same day J.M. was to be discharged from the hospital, an OPC was obtained. (N.T., 2/13/24, p. 52). The OPC was obtained due to insufficient parenting capacities, an absence of a mother-child bond, a failure to complete trainings to care for J.M., and a lack of visitation. (N.T., 2/13/24, pp. 52).

By the time J.M. was discharged from the hospital, the testimony was Mother had only visited J.M. eight to nine times over the course of his one hundred thirty three (133) day hospitalization (N.T., 2/13/24, pp. 32, 34-35). These visits were recorded by the hospital (N.T.,

8

2/13/24, pp. 40). Mother testified she visited more times but she used a wristband and was let into the hospital without checking in. (N.T., 2/13/24, pp. 108). Maternal Grandmother, who accompanied Mother to her visits, testified the number of visitations were about forty. (N.T., 2/13/24, pp. 120–121).

Sinamon Bethea, J.M.'s assigned CUA case manager, testified at the hearing as to the single case plan objectives that were created for Mother. She testified Mother was to attend all of J.M.'s medical appointments, complete all medical trainings needed, sign all consents as needed, reach out to CUA if in need of transportation to medical appointments, confirm and attend all visits, attend and comply with family school, attend and comply with a domestic violence consult, and attend and participate in services at ARC. (N.T., 2/13/24, pp. 71).

Ms. Bethea testified these single case plan objectives had not been met by Mother at the time of the adjudicatory hearing. No certification was ever presented to DHS or this Court regarding Mother's completion of CPR training. (N.T., 2/13/24, pp. 68–69). Since J.M.'s discharge, J.M. had attended eight medical appointments. Mother was invited to each of them, but she only attended two. (N.T., 2/13/24, pp. 68–69). Mother was provided with a referral to family school, but no confirmation on attendance was presented. (N.T., 2/13/24, pp. 73). Mother attended only three of the five visits with J.M. that had been offered to her. (N.T., 2/13/24, pp. 75).

This Court found the testimony of Ms. Sierra-Ortiz, Ms. Burke, and Ms. Bethea to be credible. The Court found, based on this testimony, that there is clear and convincing evidence that Mother is not presently able to provide the proper care and control necessary to support J.M.'s physical, mental, moral, and emotional health. This is due to J.M. being an infant with significant medical needs and Mother's failure to visit J.M.

9

while he was hospitalized to bond with and learn how to care for her prematurely born child. Mother was repeatedly given opportunities to provide herself with the skills necessary to care for these needs and Mother failed to provide herself with these skills. Mother also failed to obtain a certification in CPR and attend family school classes.

Mother testified she visited J.M. more than eight to nine times, and Maternal Grandmother maintained that the number of visits was closer to forty. Even accepting this testimony as true, if Mother visited J.M. forty times, she would have only visited him roughly one third of the days she was required to, which this Court finds insufficient. Even after barriers were addressed by hospital staff and DHS, and solutions were offered to ensure Mother could visit J.M., she still failed to do so. Additionally, after J.M.'s discharge, Mother was invited to attend J.M.'s medical appointments, yet she only attended two out of eight. This lack of visitation, demonstration of care, and preparation for J.M.'s medical needs leaves this Court deeply concerned for the safety of J.M. should he reside with his Mother.

Based on all of these reasons, the Court found clear and convincing evidence to adjudicate J.M. dependent based on Mother's present inability to provide proper parental care and control. The Court found clear and convincing evidence that such removal was clearly necessary for the welfare of the child. Additionally, the Court found DHS had met its burden of proof and did not shift any burden of proof onto Mother to prove that she can provide J.M. with proper parental care and control.

4-5. **This Court did not err as a matter of law or abuse its discretion by finding that DHS made reasonable efforts to prevent or eliminate the need for removal of J.M. from his home, nor did this Court err as a matter of law or abuse its discretion in determining that medical foster care was the least restrictive placement available.**

10

Mother alleges this Court erred as a matter of law and abused its discretion by finding that DHS made reasonable efforts to prevent or eliminate the need for removal of J.M. from his home. Mother also alleges this Court erred as a matter of law and abused its discretion through ordering J.M.'s placement in medical foster care in the absence of clear and convincing evidence that medical foster care was the least restrictive placement available. This Court disagrees with Mother's allegations.

For the reasons previously discussed, the Court found there is clear and convincing evidence Mother is not presently able to provide the proper care and control necessary to support J.M.'s physical, mental, moral, and emotional health. Ms. Burke testified J.M.'s Father, R.R., is incarcerated. (N.T., 2/13/24, p. 53). Ms. Bethea testified that Paternal Grandmother allegedly disputes whether J.M. is even the child of Father. (N.T., 2/13/24, pp. 79–80). Ms. Burke testified that a maternal aunt was contacted by DHS about the possibility of serving as a placement resource. (N.T., 2/13/24, p. 51). Ms. Burke stated the maternal aunt agreed to be a resource but later declined after speaking with her husband. (N.T., 2/13/24, pp. 51).

Likewise, a maternal uncle was considered, but he lived "down south," meaning that he was not an option to be a placement resource. (N.T., 2/13/24, pp. 51). Additionally, Ms. Burke testified Maternal Grandmother was not a viable option to serve as a resource considering Mother lived with Maternal Grandmother, the two were together at all meetings stressing the necessity of visitation, Maternal Grandmother was the source of transportation for Mother, and Maternal Grandmother, too, failed to visit J.M. (N.T., 2/13/24, pp. 53). According to Ms. Burke, because Maternal Grandmother did not demonstrate herself to be a strong support for Mother, a safety plan was not pursued in lieu of an OPC. (N.T., 2/13/24, pp. 59–60).

Prior to obtaining the OPC, Ms. Burke testified to have stressed to Mother and Maternal Grandmother the importance of her visitations because nobody else was available to serve as a placement resource for J.M. (N.T., 2/13/24, pp. 52). J.M. was later placed in medical foster care because of his frequency of medical appointments and the unavailability of a person to take him to these appointments. (N.T., 2/13/24, pp. 66).

After J.M.'s discharge from the hospital, eight medical appointments were scheduled on his behalf. Mother was invited to each of these but only attended two. (N.T., 2/13/24, pp. 68–69). Mother was required to receive CPR training upon J.M.'s discharge, but she never provided any certification of receiving such training. Similarly, she was asked to attend family school but certification of attendance was never provided. (N.T., 2/13/24, pp. 68–69).

The Court found the testimony of Ms. Burke to be credible. In light of this testimony, this Court found reasonable efforts were made to prevent or eliminate the need for removal. This Court heard meetings were scheduled to remove barriers contributing to Mother's failure to visit J.M. and to teach Mother how to care for J.M.'s sensitive medical needs. This Court finds that reasonable efforts were made by DHS to accommodate for Mother's barriers to visitation, but Mother still failed to visit J.M. despite these accommodations.

This Court also finds, after reasonable efforts to prevent or eliminate the need for removal were made, medical foster care was a necessary placement for J.M. This Court heard J.M. was still medically needy after his January 3, 2023, discharge from the hospital and he needed to attend medical appointments. This Court heard Mother was aware of these appointments, was asked to attend, but only attended two of the eight appointments.

This Court is not inclined to find Mother is presently capable of scheduling J.M.'s medical appointments and bringing him to these appointments for future care. Additionally,

12

Mother did not provide certification of completion of CPR training or family school. This Court makes the factual determination, after assessing the credibility of the witnesses, these trainings were not completed. As such, there is a significant concern for J.M.'s medical wellbeing should he live with Mother.

This Court heard J.M.'s Father is incarcerated and incapable of caring for J.M. Paternal Grandmother disputes whether Father is the biological father of J.M. and she is not presently available to serve as a resource for J.M. Likewise, in assessing Maternal Grandmother's presence throughout these events, this Court finds Maternal Grandmother has demonstrated she is not presently suited to care for J.M. and a safety plan was not feasible prior to obtaining an OPC. In light of J.M's medical concerns and in light of the absence of another placement resource, medical foster care was the least restrictive placement available for J.M.

Based on all these reasons, the Court found reasonable efforts by DHS to prevent or eliminate the need for removal of J.M. from his home and clear and convincing evidence that medical foster care was the least restrictive placement available.

## CONCLUSION

For the foregoing reasons, this Court respectfully requests the Order entered by this Court on February 13, 2024 adjudicating J.M. dependent and committing J.M. to the care of DHS be **AFFIRMED.**

BY THE COURT:

Date: 4/26/24

BRIAN MCLAUGHLIN, J.

13